The appellant, Victor R. Stephens, was convicted of both counts of an indictment charging him with a capital offense involving the robbery and murder of James R. Bailey, in violation of § 13A-5-40(a)(2), Code of Alabama 1975, and a capital offense involving the robbery and murder of Adam Pickens, also in violation of § 13A-5-40(a)(2). Following a sentence hearing, the jury recommended a sentence of life imprisonment without possibility of parole. The trial court, after complying with § 13A-5-47, Code of Alabama 1975, sentenced the appellant to death by electrocution.
The bodies of James R. Bailey and Adam "Pop" Pickens were discovered at Bailey's Grocery Store on Alabama Highway 14 in the Wedgeworth community near Sawyerville, in Hale County, Alabama, on January 20, 1986. Mr. Bailey, age 72, the owner of the store, was found dead inside the store — apparently of multiple gunshot wounds. Adam Pickens, age 83, was still alive, but also suffering from multiple gunshot wounds. Mr. Pickens was taken to Druid City Hospital in Tuscaloosa, Alabama, where doctors attempted to save his life. However, Mr. Pickens died while in surgery.
The evidence as presented by the State tended to establish that Mr. Bailey and Mr. Pickens were last seen alive by Mr. Bailey's daughter-in-law Sandra Bailey. Ms. Bailey "ran down" to her father-in-law's store between 4:25 and 4:30 p.m. on January 20 to purchase a gallon of milk before the store closed for the day. Sylvester Jackson came to the store between 4:30 and 5:00 p.m. to buy some gasoline for his car. After pumping the gas, Mr. Jackson entered the store to pay for the gas. He observed both victims lying on the floor. Mr. Jackson ran out of the store and rushed home to tell his mother what he had seen. His mother called the sheriff's department and told them what her son had seen.
Shortly thereafter, Hale County Sheriff H.C. Colvin, Alabama Bureau of Investigation investigator C.W. Gibson, and Alabama Department of Forensic Sciences crime scene examiner John McDuffie arrived at the store to begin their investigation and to collect any evidence which might assist them in discovering the identity of the person or persons who shot the two men. The examination of the store revealed that Mr. Bailey was robbed of money and food stamps and that Mr. Bailey had fired his .20 gauge shotgun at the robbers. Adam Pickens was unarmed. Mr. Bailey was found in the middle of the store still clutching his shotgun. Mr. Bailey had apparently been shot in a different location inside the store as there was a trail of blood leading to Bailey's body. Further examination of the scene revealed that one individual — later determined to be the appellant — had been hit by the shotgun blast as blood was found near the front door together with a .25 caliber automatic pistol. A number 8 shotgun pellet was removed from the barrel of the weapon.
Further investigation revealed that Carrie Ingram and Sheila Kennedy were walking along Alabama Highway 60 in Akron late on the afternoon of January 20, 1986. The two women were walking in the oncoming traffic lane — approximately 6 miles from Bailey's store — when they were met by a small black pickup truck traveling at a high rate of speed. The truck was proceeding in a direction away from Bailey's store. The women noticed that the passenger in the truck was black and that he appeared to be slumped over in the seat. Linda Johnson and her son Kevin also saw the black pickup on Highway 60 that afternoon. According to Ms. Johnson, she was preparing to turn left from Highway 60 onto County Road 45 when she looked into her rear-view mirror and noticed a black pickup truck coming up behind her at a high rate of speed. Despite the fact that Ms. Johnson had turned on the vehicle's left-turn signal, the truck showed no sign of reducing its rate of speed. Fearing a collision, Ms. Johnson stopped her vehicle and allowed the truck to overtake her before she completed her left turn. Although *Page 14 
she could not identify the make of the truck or who was driving it, her son Kevin readily identified it as a black Nissan pickup truck and told authorities that he had observed two black males inside the truck.
Pursuant to the information received from various witnesses and the evidence collected at the scene, the Hale County Sheriff's Department issued a regional teletype advising law enforcement agencies to "be on the lookout" for two males, armed, one possibly injured. The teletype also requested that these agencies check area clinics and hospitals for persons with possible gunshot wounds. On Tuesday, January 21, 1986, Georgia Bureau of Investigation agent Charles Stone and ABI agent Ed Traylor advised the Hale County Sheriff's Department that both subjects were in custody in Carroll County, Georgia. Further information from Georgia officials revealed that Christopher L. Starks was apprehended in possession of a .32 caliber pistol and that the appellant, Victor R. Stephens, was treated for a shotgun wound to his left hand at the Bowdon Area Hospital in Carroll County, Georgia, on Monday evening January 20, 1986.
On Wednesday, January 22, 1986, a black Nissan pickup truck owned by Christopher L. Starks, a co-defendant, was searched by law enforcement agencies. Found in the vehicle were blood stains on the passenger's seat and three (3) one-dollar denomination "food stamps" which had been issued from food stamp offices in Hale County and Tuscaloosa County, Alabama. Also taken from the glove compartment of the truck were identification papers belonging to the appellant, Victor R. Stephens.
A series of statements were taken by law enforcement officials from the appellant while he was in the custody of Georgia officials. These statements were taken orally on January 23, 25, and 28, 1986. The gist of the three statements revealed that appellant and Christopher "Peabody" Starks, left Georgia on Saturday, January 18, 1986, and traveled to New Orleans, Louisiana, where they remained until Monday, January 20, 1986. On Monday, while Stark was driving through Alabama on the way back to Georgia, the two men decided they needed some money. According to the appellant, Starks suggested that they find someplace to rob. They went into a store in Alabama occupied by an elderly white man — subsequently identified as James R. Bailey — and an elderly black man — subsequently identified as Adam Pickens. "Peabody" entered the store and displayed his weapon, while the appellant guarded the entrance. After the appellant and Starks obtained the contents of the store's cash register, they started to leave. At this time, Mr. Bailey pulled out a shotgun and fired it. Pellets from the shotgun shell struck the appellant in the left hand. It was then that the appellant "emptied" his .25 caliber pistol. According to the appellant, Starks was armed with either a .22 or .32 caliber pistol. Appellant admitted leaving his .25 caliber automatic pistol at the store. The two men then got back into their truck and drove back to Georgia.
Autopsies were performed on both victims. The results revealed that James R. Bailey died as a result of multiple gunshot wounds to the face, chest, abdomen, and hand. Two expended .32 caliber bullets and one .25 caliber bullet were removed from Mr. Bailey's body. Adam's Pickens's autopsy revealed that he died from four separate gunshot wounds to the back. All four expended bullets recovered from Pickens's body were .25 caliber bullets. The seven expended bullets removed from the victims (three from Bailey, four from Pickens) were sent to the Alabama Department of Forensic Sciences for examination. Forensic firearm examiner Lawden Yates examined each of the seven bullets. His examination revealed that the two .32 caliber bullets removed from Mr. Bailey's body were fired from the same .32 caliber pistol found on the person of Christopher Starks at the time of his arrest. The five .25 caliber bullets removed from the victims (one from Mr. Bailey, four from Mr. Pickens) were fired by the .25 caliber automatic pistol that was left at the store by the appellant. Shotgun pellets removed from Stephens's hand at the Bowdon Area Hospital in Carroll County, Georgia, were compared with shotgun pellets removed from *Page 15 
the store and the barrel of the .25 caliber gun. The analysis revealed all to be number 8 shotgun pellets, consistent with the type shell recovered from Bailey's weapon. This concluded the State's evidence.
The only evidence presented by the defense was in the form of testimony from Jessie Portis. Mr. Portis testified that he arrived at Bailey's store after Mr. Bailey and Mr. Pickens were shot. He leaned down and asked Mr. Pickens if he could say what color vehicle the robbers were in. According to Mr. Portis, Mr. Pickens responded that the robbers were in a red vehicle. When asked if the robbers were white or black, Mr. Pickens stated, "white."
 I
Stephens, a black male, was tried by a jury composed of 7 white jurors and 5 black jurors following the prosecution's use of 21 of its 23 peremptory challenges to eliminate black potential jurors. Appellant's defense counsel timely objected to the composition of his client's jury based on the State's alleged discriminatory use of its peremptory challenges, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), and Ex parte Branch, 526 So.2d 609 (Ala. 1987). Finding that the defense had established a prima facie case of racial discrimination, the trial court required the prosecution to state the reasons for its strikes, and the following reasons were given:
 1. Mr. Mickens — expressed serious reservations about imposing the death penalty.
 2. Ms. Ball — expressed serious reservations about imposing the death penalty.
 3. Mr. Ball — answered prosecutor's question concerning previous knowledge or association with illegal drugs, indicating that he, some member of his family, or a close friend had been involved with illegal drugs; his son had been in "some serious trouble" dealing with drugs and/or other criminal activity; also indicated he did not wish to serve on a jury.
 4. Mr. Patton — affirmatively answered prosecutor's question concerning previous knowledge or association of any type of criminal offense; further investigation revealed that he had been convicted of night hunting and DUI.
 5. Ms. Hood — asked to be excused from jury duty and "had quite a bit to say about lack of transportation and inability to get here and she was concerned and wouldn't be able to pay attention, etc."; husband was prosecuted and served time in jail for failure to pay court-ordered child support.
 6. Ms. Holifield — prior arrests for writing "worthless checks and similar type offenses on several different occasions."
 7. Ms. C. Harris — young, single, and unemployed; brother a defendant in a criminal prosecution.
 8. Ms. Spence — sons had been involved in "some very serious criminal offenses."
 9. Ms. Johnson — had been a defendant in small claims court and been served with numerous civil suits; appeared to be extremely responsive to the defendant's questions; also, the fact that she was chewing gum was felt to indicate her lack of respect for the seriousness of the proceedings.
 10. Ms. Cottrell — asked to be excused from jury duty; also indicated in response to prosecutor's question that she, or someone very close to her, had been charged with some criminal offense.
 11. Mr. Pratcher — although his permanent legal residence was in Hale County, he was currently living and working in Atlanta, Georgia; seemed to be interested in not serving on a jury; also was wearing sunglasses in the courtroom; also, at some time during voir dire proceedings, sat next to or appeared to have some sort of relationship with a juror excused for cause because of his views against capital punishment.
 12. Ms. Lewis — single and unemployed; her son had been involved in some sort of "death or killing."
 13. Ms. Shelton — prosecution found it "extremely strange" that every juror from her small community except her had heard something about the crime since it occurred in that community; also *Page 16 
very insistent about giving her marital status as separated.
 14. Ms. E. Williams — seemed to be very familiar with the facts of the case; indicated during voir dire that she was well aware that one of the victims had lived long enough to make a dying declaration.
 15. Ms. B. Wilson — county sheriff was acquainted with juror and recommended that she be struck because she was "extremely anti-establishment" and because of belief that her husband had been involved in some type of criminal activity.
 16. Ms. A. Harris — young, single, and unemployed; knew nothing of the facts surrounding the case.
 17. Mr. K. Williams — general appearance was very rough and unkempt; also, like Juror Pratcher, appeared to be involved with a juror struck for cause because of his views against capital punishment.
 18. Ms. Brown — husband a homicide victim; however, sheriff's department was concerned about her as a juror because of her belief that her husband's case had been mishandled.
 19. Ms. Hayes — seemed totally removed from the situation; felt that this might indicate animosity on her part, since she worked at the nursing home where the wife of one of the victims now lived.
 20. Ms. Hobson — asked to be excused from jury duty; felt that this, along with fact that she had an invalid husband and a house damaged in the previous night's storm, might affect her concentration on the case.
 21. Ms. S. Harris — relatives had been in trouble with the law.
The prosecutor's remaining two peremptory challenges were used to remove two white male jurors from the jury venire. The reasons given for these two jurors was that one "had been in criminal trouble and had been prosecuted at some point in time" and the other had a cousin that had been involved in some type of criminal activity. Defense counsel challenged the prosecutor's reasons for several of his strikes, alleging:
 "MR. MORRIS [defense counsel]: Judge, I'm not sure that I have any cross. I would make it known for the record on I think there were three people that they mentioned and that was Mr. Williams, Mr. Pratcher, and a Mr. Pratcher. Mr. Kenneth Williams and Mr. Willie Pratcher and one other individual that I believe the District Attorney alluded to as sitting near or being around Mr. Gray. I would make it known to the Court, I believe the Court would recall that during yesterday's continuous voir dire that lasted into the night, Mr. Gray was an occupant on the front row with a Mr. Corley sitting on one side and a Mr. Collins sitting on the other. Both of whom were white. To my knowledge, there was not another black individual on the front row yesterday. So I would differ with the information of the State in that regard. Now the information that the District Attorney has concerning things like they had some relatives involved in some crimes, being in small claims court where they've been sued, matters like this, in light of the — the fact that the State said they didn't respond to any questions or didn't seem to know anything about it, we contend that the jurors by comparison that were left on this case knew nothing about it. Starting with Mr. Grinstead, Mrs. Fondren, Mr. Corley, also responded that they knew nothing about it. A Mrs. Lyles responded that she knew something about it. She was left. A black female. Now Mrs. Marks responded that she knew something about it, a black female. A Mr. Ryans responded that he knew something about it, a black male. A Mrs. Travis responded that she knew something about it, a black female. Mrs. Williams responded that she knew something about it, a black female, and our contention is that it's clear that the fact that someone knows nothing about it played no part and we contend that it was strictly on the basis of race in this matter.
 "As to Mrs. Ruby Lee Brown, she stated in voir dire that her husband was a victim of a homicide and that the victim was prosecuted and there would be no other — I *Page 17 
believe she also responded — I believe she had a bumper sticker — I take that back, Your Honor. That's not true. I'm saying that there would be no reason in the world that I can think of why she would not be an excellent juror other than race. She was struck.
 "Further, we contend that the last four strikes that they enumerated, starting with Mrs. Brown, are vague and very indecisive answers. For instance, Mrs. Hayes, number 19 strike, number 40 on the venire list, stated that she knew Mrs. Bailey and that she knew her and knew her daughter and had an association with Mrs. Bailey who's in the nursing home where she's employed as well as knew her daughter well. No conceivable reason that the defense can find, no conceivable reason that she would not make an excellent juror for the State, other than the fact that she's black.
 "Now there's vague allegations on number 43, they say that her husband had been in some sort of problem. Mrs. Hobson, we contend that's just a smoke screen there. And then one of the persons up here, he had some sunglasses on. The defense contends certainly that is no justifiable reason. Now that's all I have."
The prosecutor responded as follows:
 "MR. GREENE: Our only response is that one of the first things as to Mr. Gray, it was reported to us and made quite some concern as to Mr. Gray this morning concerning who he might talk to. Now this is the information we got from the people we asked to try to pay attention. Now Mr. Williams, Gray, Patton and Pratcher, were sitting together this morning in the back of the courtroom. We felt that that might be a matter of concern. We point out for the record that the last, I think, five strikes for the State involved two white males we thought we had some problems with and three black females that we were concerned about. We also thought these three black females might make us good jurors, but we had reason, we felt, overrode our desires to retain them.
"I think that's all.
 "THE COURT: Is it your testimony as an officer of this Court that the reasons for striking were non-racial and not based upon the race of any particular juror?
 "MR. GREENE: It is, Your Honor. I think the jurors we have before us bears that out. There's black males serving, some five blacks in total. We have an abundance of females on this jury in a capital murder case. I think we've got a jury that well reflects, based upon peoples backgrounds, Your Honor, and on that basis, a fair racial mixture of males and females, black and white, in this community. We arrived at this through exhaustive and argumentative process."
Thereafter, the trial court found that appellant'sBatson motion was not well-taken, and overruled the motion.
In reviewing this issue, we find particularly helpful this Court's recent decision in Warner v. State, [Ms. 3 Div. 945, February 23, 1990] (Ala.Cr.App. 1990). In Warner, Judge Bowen, writing for the Court, stated:
 "A prosecutor may not use peremptory jury strikes in a racially discriminatory manner. Batson, supra. The principles of Batson, as interpreted by the Alabama Supreme Court, are set out in Ex parte Branch, 526 So.2d 609 (Ala. 1987), and Harrell v. State, 555 So.2d 263, 265
(Ala. 1989) ('We take this opportunity to clarify the Batson analysis.'). Applying those principles to the facts of this case, we find that the tenets of Batson and Branch have been minimally satisfied.
 "In Harrell v. State, 555 So.2d at 268, n. 1, the Alabama Supreme Court noted:
 " 'There are many possible reasonable explanations for such strikes [of blacks by the prosecution]. Batson demands that such strikes be related to the case to be tried and not be related to the defendant's and the jurors' shared race. Batson, 476 U.S. 79, 97-98, 106 S.Ct. 1712, 1723-24, 90 L.Ed.2d 69 (1986). In a given case, the following factors may be relevant and *Page 18 
may suffice to defeat the defendant's prima facie case:
 " '1. Age, fringe religious beliefs, body english, handwriting, and name association in certain instances. Tolbert v. State, 315 Md. 13, 553 A.2d 228 (1989); Chambers v. State, 724 S.W.2d 440 (Tex.Ct.App. 1987).
 " '2. Demeanor of the juror. United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987).
 " '3. Fact that prospective juror, like defendant, may be young, single, and unemployed; fact that prospective juror was struck because divorced and of low income occupation, in favor of a professional, married person; avoidance of eye contact with prosecutor. United States v. Cartlidge, 808 F.2d 1064, 1070-71 (5th Cir. 1987).
 " 'From a consideration of these factors it is clear that the explanation need not rise to the level of a challenge for cause. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, a clear, reasonable explanation for the strike must be given. Ex parte Branch, 526 So.2d 609, 623-24
(Ala. 1987).' "
". . . .
 "In [United States v.] Grandison, 885 F.2d [143] at 147 [4th Cir. 1989], it was observed: 'Although the presence of minorities on the jury does not mean that a Batson prima facie case cannot be made, . . . the fact that the jury included two black jurors is significant.' We find other observations of the court in Grandison applicable here.
 " 'No per se rule exists to establish a prima facie case of purposeful discrimination. [United States v.] Lane, 866 F.2d [103], 107 [(4th Cir. 1989)]; United States v. Sangineto-Miranda, 859 F.2d 1501, 1521 (6th Cir. 1988); United States v. Montgomery, 819 F.2d 847, 851 (8th Cir. 1987); [United States v.] Clemons, 843 F.2d [741], 746 [(3d Cir. 1988)]. But see United States v. Chalan, 812 F.2d 1302, 1314 (10th Cir. 1987). Nor does a prosecutorial checklist exist to avoid the inference of discriminatory practices. "The Supreme Court's mandate in Batson to consider all the facts and circumstances means that we cannot lay down clear rules as to [what] . . . will constitute or refute a prima facie case." Sangineto-Miranda, 859 F.2d at 1521.
" '. . . .
 " 'A prima facie case of discrimination does not arise "every time a prosecutor strikes a black prospective juror." Lane, 866 F.2d at 105. Numerous valid factors may influence a prosecutor to strike a particular potential juror, including "current and past employment, general appearance and demeanor, previous jury service, and the absence or presence of apparent prejudice." Id.
at 106 While prosecutors may not challenge prospective jurors because of their race, they may exercise their peremptory challenges " 'for any reason at all, as long as that reason is related to [their] view concerning the outcome' of the case to be tried." Batson, 476 U.S. at 89, 106 S.Ct. at 1719, quoting United States v. Robinson, 421 F. Supp. 467, 473 (D.Conn. 1976), mandamus granted sub. nom. United States v. Newman, 549 F.2d 240 (2d Cir. 1977). Peremptory challenges have long been exercised to ensure both parties the existence of a fair and impartial jury; the usefulness of this device could be undermined by restrictive appellate rulemaking.'
Id. at 147, 149."
Slip op. at 17.
Just as in Warner, we find that the tenets of Batson andBranch have been minimally satisfied.
The fact that a prospective juror has reservations about imposition of the death penalty may constitute a race-neutral reason for the exercise of a peremptory strike. Warner, supra;Smith v. State, 531 So.2d 1245, 1247-48 (Ala.Cr.App. 1987);Levert v. State, 512 So.2d 790, 795-96 (Ala.Cr.App. 1987). Thus, the prosecutor's use of peremptory challenges to remove Mr. Mickens and Ms. Ball (numbers 1 and 2) from appellant's jury were entirely proper. *Page 19 
Connection with or founded suspicion of criminal activity can also constitute a sufficiently race-neutral reason for the exercise of a peremptory challenge. Warner, supra; Powell v.State, 548 So.2d 590, 592-93 (Ala.Cr.App. 1988), aff'd on othergrounds, 548 So.2d 605 (Ala. 1989); Lynn v. State,543 So.2d 704, 709 (Ala.Cr.App. 1987), aff'd, 543 So.2d 709 (Ala. 1988)cert. denied, ___ U.S. ___, 110 S.Ct. 351, 107 L.Ed.2d 338
(1989); Ward v. State, 539 So.2d 407, 408 (Ala.Cr.App. 1988);Avery v. State, 545 So.2d 123, 126 (Ala.Cr.App. 1988); Lewis v.State, 535 So.2d 228, 232 (Ala.Cr.App. 1988); Currin v. State,535 So.2d 221, 223 (Ala.Cr.App.), cert. denied, 535 So.2d 225
(Ala. 1988). This connection with or suspicion of criminal activity includes not only the juror in question, but also relatives and close friends of the juror. United States v.Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987); Scales v. State,539 So.2d 1074, 1074-75 (Ala. 1988); Lynn v. State, supra, 543 So.2d at 709; Avery v. State, supra, 545 So.2d at 136; Ward v.State, supra, 539 So.2d at 408; Lewis v. State, supra, 535 So.2d at 232. Thus, the prosecutor's use of peremptory challenges to remove Mr. Ball, Mr. Patton, Ms. Holifield, Ms. C. Harris, Ms. Spence, Ms. Cottrell, Ms. Lewis, Ms. B. Wilson, and Ms. S. Harris (numbers 3, 4, 6-8, 10, 12, 15, and 21) from appellant's jury was also proper.
Likewise, the fact that child support proceedings have been brought against a juror or someone closely connected with that juror has been held to be a race-neutral reason for the exercise of a peremptory challenge. Warner v. State, supra, slip op. at 8; Lynn v. State, supra, 543 So.2d at 709; Currinv. State, supra, 535 So.2d at 223. Thus, the prosecutor's removal of Ms. Hood (number 5) from the jury was proper based on this ground.
A hostile attitude toward law enforcement or dissatisfaction with the police has also been upheld as a sufficiently race-neutral explanation for the use of a peremptory challenge.Warner v. State, supra, slip op. at 8; Powell v. State, supra, 548 So.2d at 593. Thus, the prosecutor's removal of Ms. Brown (number 18) was proper.
The fact that a prospective juror, like the defendant, is young, single, and unemployed is also a sufficiently race-neutral reason for the exercise of peremptory challenges, since such jurors may identify with the defendant. Young, single, and unemployed jurors may also be struck in favor of professional, married persons. Harrell v. State, 555 So.2d 263,268 n. 1 (Ala. 1989); Harris v. State, 545 So.2d 146, 147
(Ala.Cr.App. 1988); Currin v. State, supra, 535 So.2d at 223. Thus, the prosecutor's removal of Ms. C. Harris and Ms. A. Harris (numbers 7 and 16) was proper. We would also note that Ms. C. Harris was also properly removed because of the fact that her brother was a defendant in a criminal prosecution as discussed above.
Likewise, the demeanor of a juror can also provide a sufficiently race-neutral explanation for a prosecutor's use of a peremptory challenge. Harrell v. State, supra, 555 So.2d at 268 n. 1; Warner v. State supra, slip op. at 8. See also UnitedStates v. Forbes, supra, 816 F.2d at 1010. Demeanor, the way in which a person behaves or conducts himself, can include a number of characteristics, such as the desire not to serve as a juror, disinterest in the proceedings as a whole, inattentiveness exhibited by talking with others during voir dire, perceived hostility in answering prosecution questions, perceived favoritism toward the accused, or simply a general lack of respect for the proceedings which could be exhibited by such behavior as chewing gum, wearing sunglasses, hats, excessive jewelry, or inappropriate clothing while inside the courtroom. See Harrell v. State, 555 So.2d at 268 n. 1; Harrisv. State, supra, 545 So.2d at 147; Currin v. State, supra, 535 So.2d at 223. See also Lockett v. State, 517 So.2d 1346 (Miss. 1987) cert. denied, 487 U.S. 1210, 108 S.Ct. 2858,101 L.Ed.2d 895 (1988) (wearing of hat, hostility toward prosecution, desire not to serve because of invalid parent);Taitano v. Commonwealth, 4 Va. App. 342, 358 S.E.2d 590 (1987) (age, dress, demeanor); Chambers v. State, 724 S.W.2d 440
(Tex.Ct.App. 1987) *Page 20 
(age, body english); Townsend v. State, 730 S.W.2d 24
(Tex.Ct.App. 1987) (inattentiveness); Smith v. State, 734 S.W.2d 694
(Tex.Ct.App. 1987) (excessive jewelry). Thus, the prosecutor's removal of Ms. Johnson, Mr. Pratcher, Mr. K. Williams, Ms. Hayes, and Ms. Hobson (numbers 9, 11, 17, 19, and 20) was proper. We would note, however, that we have grave reservations concerning the prosecutor's desire to strike jurors Pratcher and Williams based on their proximity to another juror who had expressed his opposition to the death penalty.
The fact that a juror is overly familiar with the facts of a case has been held sufficiently race-neutral to satisfy a reviewing court. See Harris v. State, supra, 545 So.2d at 147. Thus, it was proper for the prosecutor to remove Ms. E. Williams (number 14) based on her familiarity with this case, particularly because of her knowledge that one of the victims made a dying declaration — an essential part of the defendant's case. It is only logical that a prosecutor would wish to strike a juror who had indicated that she would place a great deal of importance in a piece of evidence crucial to the theory of defense.
Finally, the fact that a prosecutor distrusts a juror or finds his responses not to be credible has also been held to be a sufficiently race-neutral reason for using a peremptory challenge. Rodgers v. State, 725 S.W.2d 477, 480 (Tex.Ct.App. 1987). As the prosecutor explained, he found the fact that Ms. Shelton (number 13), a resident of the community in which the crime had occurred, had absolutely no knowledge of the crime "extremely strange" in light of the fact that every other juror from that particular community had heard of the incident. We find this to be a sufficiently race-neutral reason. While members of the jury venire from other parts of Hale County might not have heard of this incident, we likewise find it extremely strange that a resident of such a small community would have absolutely no knowledge of an incident of this magnitude which occurred in her own back yard.
" '[T]he vagarious process of choosing jurors need not be controlled by a simple equation; it may be influenced by intuitive assumptions that are not fatally suspect merely because they are not quantifiable, see [United States v.]Forbes, 816 F.2d [1006] at 1010-11 [(5th Cir. 1987)], and by the interplay of various factors, see United States v. Lewis,837 F.2d 415, 417 n. 5 (9th Cir. 1988)' [cert. denied,488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988)]." Warner v. State,supra, slip op. at 12, quoting United States v. Lance,853 F.2d 1177, 1181 (5th Cir. 1988). While this Court has concern about several of the reasons articulated by the prosecutor for the exercise of his peremptory jury challenges, we find that, as a whole, the prosecutor provided sufficiently race-neutral reasons for the exercise of those challenges.
 " 'In reviewing the trial court's finding that the strikes were nondiscriminatory, we can only reverse if we find that that determination was clearly erroneous.' Williams [v. State] 548 So.2d [501] at 504 [Ala.Cr.App. (1988)]. Accord, Ex parte Branch, 526 So.2d at 624. ' "In a Batson context, the Supreme Court observed that because the trial judge's findings 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' Batson, 476 U.S. at 98, n. 21 [106 S.Ct. at 1724, n. 21]." ' Owens v. State, 531 So.2d 22, 23 (Ala.Cr.App. 1987), quoting State v. Antwine, 743 S.W.2d 51, 66
(Mo. 1987), cert. denied, [486] U.S. [1017], 108 S.Ct. 1755, 108 L.Ed.2d 217 (1988). 'In reviewing the lower court's ruling, we have been mindful that it is not our function to decide this issue de novo, to "duplicate the role of the lower court." ' Owens, 531 So.2d at 24. The finding of the trial judge 'is entitled to considerable deference on appeal.' Harrell, 555 So.2d at 268. See also Scales v. State, 539 So.2d 1074, 1075 (Ala. 1988). ('[W]e are convinced that the trial judges in our system are in a much better position than appellate judges to decide whether the truth has been stated')."
Warner v. State, supra, slip op. at 17, 18. Just as in Warner, we find the trial court's *Page 21 
ruling was not clearly erroneous. Accordingly, no reversal is warranted.
 II
Appellant next contends that the trial court erred in denying his motion for mistrial based upon the prosecutor's comments during closing argument that defense counsel was attempting to hide evidence from the jury. We would first note that we have thoroughly examined the portion of the record that contains the closing arguments of counsel and we can find no instance — either during closing arguments or at the conclusion of said arguments — where defense counsel moved for a mistrial. Moreover, appellant's brief fails to specify exactly which portion of the prosecutor's argument was erroneous. Since, however, defense counsel objected to but one portion of the State's closing arguments, we will examine that portion of the State's closing argument.
At the close of the evidence, the prosecutor made his first closing argument, to which defense counsel made no objections. Defense counsel then made his closing argument, during which he attempted to poke holes in the State's case by raising questions concerning the credibility of the State's evidence and the failure of the State to present certain evidence. After defense counsel made his closing argument, the prosecutor made his final closing argument to the jury. He argued, in pertinent part, as follows:
 "The Defense attorney says, Oh, well, you know, all these policemen got there and they forced him to confess. Now wait a minute, folks, you read what the man said. He said over and over if they're going to force him to confess, if they're going to make it up, how about let's add a few more good facts that would make it nicer to read. He doesn't have him saying that it was somebody else's idea and somebody shot at me and I just shot back. Let's not say that. Let's don't say that I went in there and shot the man because I'm a cold-blooded killer, well, obviously, he didn't put that in there because they took down what the man told him. You can't add and you can't take away. It's their job and they're trained that way. We come up here and every one of these cases over and over and over again, and what we get tried is that they tried to try the policemen. They said he did everything wrong. They also try to throw smoke at you and cover up all the evidence and point you off in some direction out yonder. They don't think you've got sense enough to hear what is going on up here.
 "MR. MORRIS: I object. The jury has got fine sense. I resent that the District Attorney is making any reference to the fact that I don't think the jury has got good sense.
 "MR. GREENE: I've got every right to comment on the evidence.
"THE COURT: This is argument of counsel. Continue.
 "MR. GREENE: Mr. Morris stood up here in the course of this trial and threw smoke at you every way he could. Now why is he doing that? Well, obviously any report about anybody with a shot hand anywhere around here was going to be looked into. That's clear as a bell. But you're supposed to think that it's somebody else. Now what does the evidence connect to? It connects to Stephens."
When determining whether a prosecutor's statement requires reversal
 ". . . 'it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer.' Washington v. State, 259 Ala. 104, 65 So.2d 704
(1953); Gibson v. State, 347 So.2d 576
(Ala.Crim.App. 1977); Rutledge v. State, [Ms. 5 Div. 610, August 16, 1983] [482 So.2d 1250] (Ala.Crim.App. 1983). The rule in Alabama is that 'remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements.' Shewbart v. State, 33 Ala. App. 195, 32 So.2d 241, cert. denied, *Page 22 249 Ala. 572, 32 So.2d 244 (1947); Camper v. State, 384 So.2d 637 (Ala.Cr.App. 1980); Wilder v. State, 401 So.2d 167 (Ala. 1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App. 1983); Rutledge, supra."
Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App. 1984). Seealso United States v. Robinson, 485 U.S. 25, 108 S.Ct. 864,99 L.Ed.2d 23 (1988); Cason v. State, 515 So.2d 721, (Ala.Cr.App.), cert. denied, 515 So.2d 725 (Ala. 1987).
In Dossey v. State, 489 So.2d 662, 665 (Ala.Cr.App. 1986), Judge Bowen, writing for this court, stated as follows:
 "The prosecutor has a right to comment on and answer statements made by defense counsel in argument to the jury. Dollar v. State, 26 Ala. App. 361, 159 So. 704 (1935); Moragne v. State, 16 Ala. App. 26, 28, 74 So. 862, 864, reversed on other grounds, 200 Ala. 689, 77 So. 322 (1917). Counsel should be afforded wide latitude in responding to assertions made by opposing counsel in previous argument. York v. State, 34 Ala. App. 188, 190, 39 So.2d 694, 696 (1948), cert. denied, 252 Ala. 158, 39 So.2d 697 (1949). 'Wide latitude is given the solicitor in making reply to argument previously made by appellant's counsel.' Moody v. State, 40 Ala. App. 373, 374, 113 So.2d 787, 788 (1959). '[W]ide latitude is given a district attorney in making reply in kind, . . . and the propriety of argument of counsel is largely within the trial court's discretion.' Jetton v. State, 435 So.2d 167, 171 (Ala.Cr.App. 1983)."
Our examination of the record convinces this Court that the prosecutor was merely replying in kind to arguments made by defense counsel. During his argument to the jury, defense counsel made many disparaging references to the strength of the State's case. He attacked the State's evidence, particularly the failure by State experts to be able to positively identify whether the type B bloodstains found at the scene of the crime could have come from only the appellant and no other person. Defense counsel also questioned the State's failure to introduce certain evidence, namely a hat and gloves recovered during the course of the investigation. He pointed out to the jury the inability of ballistics experts to positively identify the shotgun pellets removed from appellant's hand as having come from the victim's shotgun. Defense counsel further pointed out that appellant's fingerprints were never found at the scene of the crime, not even on the .25 caliber automatic pistol that he admitted owning. Following these statements, defense counsel then told the jury that "I want the man [referring to the prosecutor] who's got the last shot to tell you about this too." Defense counsel's statement was a clear invitation to the prosecutor to reply to his statements, which he did. As seen above, the essence of the State's final closing argument was that defense counsel was trying to throw the jury off by pointing them in other directions than at his client. The prosecutor merely responded to defense counsel's previous argument. Accordingly, his comments do not warrant reversal.
"Moreover, statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth." Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988). See also Orr v. State, 462 So.2d 1013, 1016
(Ala.Cr.Al)p. 1984); Sanders v. State, 426 So.2d 497, 509
(Ala.Cr.App. 1982). The prosecutor admitted as much when he informed the jury that statements made by counsel in closing arguments were not evidence and that sometimes personalities were interjected into the argument, but indicated that this was merely the attorneys doing their job to represent their side of the case the best way they knew how. As we have previously stated,
 "Control of closing argument rests in the broad discretion of the trial judge and, where no abuse of discretion is found, there is no error. Thomas v. State, 440 So.2d 1216 (Ala.Crim.App. 1983); Robinson v. State, 439 So.2d 1328
(Ala.Crim.App. 1983); Elston v. State, 56 Ala. App. 299, 321 So.2d 264 (1975). The trial judge can best determine when discussion *Page 23 
by counsel is legitimate and when it degenerates into abuse. Hurst v. State, 397 So.2d 203
(Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala. 1981); Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958)."
Sasser v. State, 494 So.2d 857, 860 (Ala.Cr.App. 1986). As can been seen from an examination of the record, the trial judge maintained close control of closing arguments by both attorneys, and, on several occasions when argument became heated, warned counsel not to overstep their bounds, then instructed the jury that what was said in argument was not to be considered as evidence. We find no abuse of discretion by the trial court. Accordingly, this issue does not warrant reversal.
 III
Appellant also contends that the prosecutor was guilty of prosecutorial misconduct when he tried to impeach him for a crime for which he had not been convicted. In the sentence phase of appellant's trial, during cross-examination of the appellant the following occurred:
"Q I see; You know a Mr. Saxon?
"A Yes.
 "Q Do you have anything to do with a robbery of his place of business there in Carrollton, Georgia?
"A No, sir.
"Q You deny that?
 "A Yes, sir. Because Mr. Saxon knows me personally.
"MR. MORRIS: Judge, could we speak to you?
 (Whereupon the following proceedings were held in the presence of, but out of the hearing of the jury:)
 "MR. MORRIS: The Defendant moves for a mistrial in this proceeding. He asked him about a specific offense that he has not been convicted of. He's not been arrested in that and he denies it. The Defendant moves for a mistrial.
 "MR. GREENE: Your Honor, the Defendant has entered a defense trying to show repentance of a life of crime and he's committed all these offenses. He's been asked about all these offenses. Now he brought it up, we didn't. That's why I did it. I think I'm justified in asking this question.
 "MR. MORRIS: Judge, he made the statement — well, I renew my motion and insist on my motion. The law is specific about that, Judge.
"THE COURT: He asked him if he denied it.
 "MR. MORRIS: He can't ask that. Now I didn't bring up anything about Mr. Saxon and he knows that.
 "THE COURT: I know that. I'll deny the motion at this time.
"MR. MORRIS: I do object.
"THE COURT: I understand."
Generally, the fact that the accused, or any witness, has been investigated, arrested, charged, or indicted is inadmissible to impeach such witness, unless he was subsequently convicted of that offense. Smitherman v. State,521 So.2d 1050, 1059 (Ala.Cr.App. 1987), cert. denied,521 So.2d 1062 (Ala. 1988). in the instant case, however, the prosecutor's question came during the sentence phase of his bifurcated trial. This is an important distinction because of the provisions of § 13A-5-45(c) and (d), which provide in pertinent part as follows:
 "(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51, and 13A-5-52. . . .
 "(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. . . ."
Thus, it is clear that the usual strict rules of evidence are not applicable to sentencing hearings.
Here, appellant testified in great detail at his sentencing hearing in an attempt to establish a mitigating circumstance — specifically, *Page 24 
remorse and repentance for his previous life of crime. In order to counter appellant's testimony and to establish the aggravating factor of an extensive criminal history, it was incumbent upon the prosecutor to cross-examine appellant about his prior criminal activities. Thus, it was both relevant and probative for the prosecutor to question appellant about the specifics of his extensive criminal history. Appellant was given ample and fair opportunity to rebut the prosecution's evidence concerning his prior criminal history, and, in fact, admitted to having been convicted of all but the above complained-of incident. By denying this incident, appellant, in effect, did rebut it.
Moreover, since the harmless error rule applies to capital sentencing hearings, Ex parte Whisenhant, 482 So.2d 1241, 1244
(Ala. 1983), no reversal should be had when no undue prejudice resulted to appellant by this inquiry. While we recognize that this rule is to be applied with extreme caution in capital cases, Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984), we nevertheless find that the instant case is one in which this rule should be applied. First, if appellant were trying to establish a mitigating circumstance based on his remorse and repentance for his life of crime, then his negative answer did not injure that effort. That effort was not dependent upon his showing of a history of crime, but rather, upon his "acquiring religion," remaining drug-free, writing a book warning others about the dangers of drug-abuse, and generally demonstrating good behavior since his imprisonment. Second, being questioned about this incident did not harm him in the sense that absent this incident the State would have failed to establish the aggravating circumstance of appellant's extensive criminal history. In light of the fact that appellant had already admitted to two armed robberies, three burglaries, and a theft, we fail to see that this last inquiry had any unduly prejudicial impact on the members of the jury given what they had already heard. Had this been a situation where appellant had no prior criminal history, then the State's asking the above complained-of question would most likely have been prejudicial to the appellant. As that is not the case here, the prosecutor's question resulted in no undue prejudice to the appellant. Therefore, no reversal is warrant for his behavior.
 IV
The appellant next contends that the evidence adduced at trial was insufficient to support his convictions for capital murder. Specifically, Stephens contends that the State failed to present any direct evidence which linked him to the murders of James R. Bailey and Adam Pickens.
We first note that the mere fact that evidence is of a circumstantial nature does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App. 1984). The test of the sufficiency of circumstantial evidence is not whether the possibility exists that someone other than the accused committed the crime, but rather whether the evidence excluded every reasonable hypothesis but that of the accused's guilt. Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978),cert. denied, 368 So.2d 877 (Ala. 1979). Viewing the State's evidence presented to the jury, which is set out above, under the principles enunciated in Cumbo, supra, we find that when viewed in the light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of appellant's guilt. The State's evidence established the following: On the afternoon of January 20, 1986, Mr. James R. Bailey and Mr. Adam Pickens were robbed, shot, and left for dead in Bailey's Store in rural Hale County. They were last seen alive around 4:30 that afternoon. Sylvester Jackson discovered the crime when he went to the store to buy gasoline for his car around 4:45 p.m. At roughly the same time, Ms. Carrie Ingram and Ms. Sheila Kennedy observed a small black pickup truck proceeding rapidly down the road going away from Bailey's store. They saw *Page 25 
two people in the truck. Ms. Kennedy believed the passenger was black, but could not be certain since he was slumped down in the seat. Ms. Linda Johnson and her son Kevin also observed the pickup truck in the vicinity of Bailey's store between 4:30 and 5:00 that afternoon. Kevin was able to identify the truck as a black Nissan pickup truck, and he had observed two black males inside the truck. Investigators recovered a .20 gauge shotgun, a .25 caliber automatic handgun, and several bullets and shotgun pellets at the scene of the robbery-homicide. Samples of bloodstains — later determined to be type B blood — at the scene were also taken. From the location of some of the blood stains, investigators determined that Mr. Bailey had very likely shot one of the robbers in the hand with his shotgun. Based on this information, Hale County authorities issued a "be on the lookout" for two armed males, one possibly injured. The following day, Georgia officials discovered the appellant, who had type B blood, in a local hospital being treated for a shotgun blast to his hand. A black Nissan pickup truck registered to the family of Christopher Starks was taken into custody and searched that same day. Among the items recovered were a box of .22 caliber Federal ammunition, a box of Remington ammunition, a box of .25 caliber Federal ammunition, and two wigs. Also found in the truck's floorboard and on the right front seat were some bloody rags, a holster for a .25 caliber pistol, cotton gloves, blood on the seat, and two weapons — a .32 and a .22 caliber revolver — in a Hardee's sack. The glove compartment contained some food stamps — later determined to have been issued in Alabama, specifically Hale and Tuscaloosa counties — and several pieces of identification of the appellant Victor R. Stephens. Subsequent scientific testing revealed that the bullets recovered at the scene of the crime and from the two victims were fired from the .32 caliber revolver recovered from the black Nissan truck and the .25 caliber automatic pistol recovered at the scene. The bloodstains found in the truck were determined to be from type B blood. Additionally, appellant made three separate statements to authorities, in which he admitted his participation in the robbery — homicides at Bailey's store. Clearly, the evidence was inconsistent with any reasonable theory of innocence. Indeed, all material circumstances in the evidence point to the defendant's guilt. Thus, we find that the evidence presented at trial was sufficient to sustain the appellant's convictions.
 V
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and § 13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving appellant's conviction and the propriety of his death sentence.
The appellant, Victor R. Stephens, was indicted and convicted for violating § 13A-5-40(a)(2), Code of Alabama 1975, an offense which is punishable by death.
There is no suggestion in the record that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and there is no evidence to support any such contention.
Our review of the sentence proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of two aggravating circumstances: first, that the capital offense was committed while the defendant was engaged in the commission of a robbery, § 13A-5-49(4), Code ofAlabama 1975; and second, that the defendant had been previously convicted of a felony involving the use or threat of violence to the person, § 13A-5-49(2), Code of Alabama 1975. After considering each of the statutory mitigating circumstances set out in § 13A-5-51, Code of Alabama 1975, and the possibility of any non-statutory mitigating circumstances as allowed by § 13A-5-52, Code of Alabama 1975, the trial court found the existence of no statutory mitigating circumstances. The trial court did, however, find that the defendant's recognition of his drug abuse as the cause for his behavior and his actions in writing a book that would warn teenagers *Page 26 
of the pitfalls of using drugs to be a non-statutory mitigating circumstance to be considered in sentencing the defendant.
Our independent weighing of the aggravating and mitigating circumstances convinces this court of the propriety of the death sentence in this case.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Indeed, fully two-thirds of Alabama death sentences have been imposed on defendants convicted of capital murder arising out of robbery-homicides. Beck v. State, supra, 396 So.2d at 654 n. 5. See also, e.g., Hinton v. State, 548 So.2d 547 (Ala.Cr.App. 1988), aff'd, 548 So.2d 562 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Bell v. State,475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.),cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585
(1985); Jones v. State, 456 So.2d 366 (Ala.Cr.App. 1983),aff'd, 456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062,105 S.Ct. 1779, 84 L.Ed.2d 838 (1985).
 VI
Appellant's final contention is that death by electrocution as applied by the State of Alabama constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. This argument has previously been rejected. In addressing this issue, this Court, per Judge Patterson, held in Jackson v. State, 516 So.2d 726,737 (Ala.Cr.App. 1985), remanded on other grounds,516 So.2d 768 (Ala. 1986), that
 "The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: 'Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarious, — something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned 'that this act was passed in the effort to devise a more humane method of reaching the result'. Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir. 1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
See also Wright v. State, 494 So.2d 726; 741 (Ala.Cr.App. 1985), aff'd, 494 So.2d 745 (Ala. 1986), cert. denied,479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987). The appellant has presented no evidence that this state's method of execution involves torture, and thus, no reason exists for this Court to overrule its previous holdings on this issue.
 VII
Finally, we have searched the entire record for any plain error or defect which might have adversely affected the appellant's substantial rights and have found none. Rule 45A, A.R.App.P.
The appellant received a fair and impartial trial. Therefore, his convictions for these capital offenses and his sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.