[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1252 
Appellant was indicted and convicted under § 13A-5-31 (a)(2), Code of Alabama 1975, for robbery when the victim is intentionally killed. A hearing was held to determine punishment. After weighing the aggravating and mitigating circumstances, the jury fixed appellant's punishment at death. In a second hearing,[1] the trial court, in accord with §§ 13A-5-32, -33, -35, -36, Code of Alabama 1975, sentenced appellant to death.
On December 23, 1980, appellant met with codefendants Rayfield Davis and Alvin Morgan. They decided to rob someone in Columbus, Georgia. Morgan borrowed a .32 caliber pistol from one Lucille Austin. The trio went to the Paradise Club, a bar in Columbus, and saw codefendant Billy Threatts. The trio told Threatts of their plan to rob someone and he decided to join them. Around 10:15 p.m., the quartet went to the Green Theater. Threatts, seeing a van parked next to the theater, had the group wait for the owner to come out so they could take his keys and steal the van.
The victim, Gable Holloway, while walking toward his van, was assaulted by Threatts and forced into the van.
While riding around, appellant searched Holloway and found marijuana in his coat. He also took $20 to $25 and a watch from Holloway.
The group smoked the marijuana as they traveled highway 280/431 toward Opelika. Before reaching Opelika, Threatts turned onto a dirt road near the community of *Page 1253 
Salem. After driving about a mile down the road, Threatts stopped the van and everyone, including Holloway, got out. Appellant asked Threatts what they were going to do with Holloway. Both Threatts and Davis said that Holloway had to be killed because he knew them. Threatts walked to appellant and "pushed the gun on [him]." One of the group stated, "[g]o on, do something." Throughout the ordeal, Holloway begged for his life stating, "[p]lease don't kill me. I have a wife and kids, and a grandmother that I have to support." Appellant, from a distance of about five or six feet, fired at Holloway. The victim did not fall, so appellant fired two more shots at him. The quartet began to leave when someone said, "[e]mpty the gun." Appellant turned around and fired two more shots at the fallen Holloway. The victim's body was found around 3 a.m. on December 24, 1980 by a resident of the Salem community. He notified the authorities.
During the trip back to Phenix City, appellant gave the gun to Davis. Around 11 p.m. on December 24, 1980, the victim's van was found in a parking garage in Columbus. The fingerprints of Threatts, Davis, and Morgan were found in the van, but not those of appellant. On January 6, 1981, after an intensive investigation, appellant was arrested. At the time of his arrest, appellant was on parole for three second degree burglary convictions.
Dr. Thomas Gilchrist, a pathologist, determined the victim's cause of death to have been from multiple gunshot wounds. He removed four bullets from the body of the victim and sent them to tool and firearms examiner Lonnie Hardin for analysis.
After the police had talked to Morgan, they were able to retrieve the murder weapon from Lucille Austin. It was sent to Lonnie Hardin for ballistics tests. Hardin determined that the bullets removed from the victim had been fired from the gun.
 I
Appellant, through his motion to quash the indictment, challenged the composition of the grand jury which indicted him, and the petit jury which convicted him. The thrust of his contention is that the methods of selecting prospective jurors for the master jury list and master jury book,[2] compiled by the Lee County Jury Commission, systematically excluded "young persons." Appellant identified "young persons" as nineteen to twenty-four year old Auburn University students who were residents of Alabama.
Appellant hired an expert in the field of public opinion research to conduct a study to determine the number of currently enrolled Auburn University students who would qualify as prospective jurors, the number of students included on the prospective jurors list, and to compare social attitudes between the students and non-student residents of Lee County. During the course of the trial, it became clear that the study conducted by the expert was flawed. Questions used in the surveys were ambiguous and important facts were overlooked. Two factors overlooked were: (a) that eighteen year olds were included in the study, and (b) that most Auburn students were not present during the summer and, therefore, not "residents" of Lee County. The study concluded that young Auburn students were under-represented by about twenty percent on the jury list of Lee County.
It is a constitutional requirement that both grand and petit juries be drawn from a panel of prospective jurors which represents a fair cross-section of the community. Duren v.Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979);Smith v. State, 364 So.2d 1 (Ala.Cr.App. 1978). To establish a prima facie violation of the fair cross-section requirement, a defendant must show: (1) that the group or class of *Page 1254 
persons in question is a "distinctive" group in the community; (2) that the group forms a substantial and identifiable segment of the total population of the community and representation of it in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that such underrepresentation, generally and on appellant's venire, is due to their systematic exclusion in the jury-selection process. Duren, 439 U.S. at 364, 366,99 S.Ct. at 668, 669; United States v. Berry, 627 F.2d 193 (9th Cir. 1980), cert. denied, 449 U.S. 1113, 101 S.Ct. 925,66 L.Ed.2d 843 (1981); Smith, supra, at 10. Mere statistical disparity between the number of the group presumed eligible for jury service and the number actually included in the master jury list or box does not of itself establish a primary inference of violation of the fair cross-section requirement.Smith, supra, at 10-11.
We question whether appellant's class of persons, i.e., "young persons nineteen to twenty-four years of age who are Alabama residents and Auburn University students," is a "distinctive" group under Duren and Taylor v. Louisiana,419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). There is no doubt that appellant confined his group by age and further limited it by "occupation," i.e., student. Nevertheless, the key to his class is age; otherwise, he would have included all Alabama resident Auburn University students.
In order for a group to have cognizability or distinctiveness, there must be some factor, quality, or attribute in existence which defines and limits it. It must have a definite composition whose membership does not shift from day to day or whose members cannot be arbitrarily selected. The group must also have a cohesiveness of attitudes, ideas, or experience which serves to distinguish it from the general milieu and which cannot be adequately represented if the group is excluded from jury service. In addition, there must be a possibility that exclusion of the group from jury service will result in partiality, bias, or prejudice on the part of the juries hearing cases in which purported group members are involved. Stated another way, the group must exhibit a community of interest which cannot be adequately protected by the remainder of the populace. United States v.Guzman, 337 F. Supp. 140 (S.D.N.Y.), aff'd, 468 F.2d 1245 (2d Cir. 1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1397,35 L.Ed.2d 602 (1973).
Age has been held not to be a valid criterion in determining whether an "identifiable" or "distinctive" group, for purposes of a jury system reflecting a fair cross-section of the community, has been excluded. Smith, supra, at 11. The United States Supreme Court has not decided whether "young people," i.e., a group based upon age limitations, constitutes a "cognizable" or "distinctive" class. Hamling v. United States,418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Numerous federal and state jurisdictions have determined that it does not. See e.g., Davis v. Greer, 675 F.2d 141 (7th Cir. 1982);Brown v. Harris, 666 F.2d 782 (2d Cir. 1981), cert. denied,456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); United Statesv. Potter, 552 F.2d 901 (9th Cir. 1977); United States v.Blair, 493 F. Supp. 398 (D.Md. 1980), aff'd, 665 F.2d 500 (4th Cir. 1981); United States v. Guzman, supra; Williamson v.State, 52 Ala. App. 617, 296 So.2d 241 (1974). Furthermore, students have not been recognized as a cognizable or distinctive group. See Brown v. Harris, supra.
After a careful review of the record and the authorities cited above, we conclude that appellant has failed to establish a cognizable or distinctive class under the first requirement of Duren.
Further, the questionable statistical method used to reach the appellant's conclusion that the disparity of underrepresentation is "statistically significant" does not require an a priori finding that the Lee County jury selection system fails to comply with either statutory or constitutional requirements. See generally United States v. Test, 550 F.2d 577
(10th Cir. 1976). *Page 1255 
Consequently, we find no error in the trial court's ruling on appellant's motion to quash the indictment.
 II
Appellant contends that his written confession was erroneously admitted into evidence. Appellant's argument is that his illiteracy rendered him mentally incapable of understanding and waiving his Miranda rights. Consequently, he argues that his confession was involuntarily made.
At appellant's motion to suppress, Lee County Deputy Sheriff Ronnie Watkins testified that on January 6, 1981, he talked to appellant at the Sheriff's Department. Appellant was in custody and charged with capital murder at the time of the conversation.
Watkins stated that only appellant and he were present during the interview. He introduced himself to appellant and explained the charge filed against him. Watkins then read appellant hisMiranda rights. Watkins filled out the waiver portion of the form and asked appellant if he understood it. Appellant said yes and signed the waiver.
Watkins asked appellant how he knew Threatts, Davis, and Morgan. After appellant denied knowing the trio, Watkins revealed several facts discovered through the investigation. Appellant decided to tell Watkins what happened. He described the trip to Columbus and the conversation with Threatts at the Paradise Club. He detailed the events leading up to the abduction of the victim. Appellant told Watkins that the victim was robbed. He said that the victim begged for his life while the quartet debated his fate. Appellant admitted shooting the victim.
Watkins testified that he never had any difficulty understanding appellant, and appellant never indicated that he did not understand. Watkins stated that appellant told him that he could read and write. Appellant read both his Miranda rights and the waiver form; appellant signed the forms. The proper voluntariness predicate was established.
Lee County Sheriff's investigator Gene Spencer testified that on January 7, 1981, he interviewed appellant at the Opelika Police Department. He indicated that appellant had been arrested the day before on a parole violation. Spencer was aware of the fact that appellant had talked to Watkins prior to his interrogation of him. Spencer's purpose in interviewing appellant was to reduce appellant's statement to writing.
Appellant informed Spencer that he could read and write. Spencer read appellant his Miranda rights. The same was done with regard to the waiver form. Appellant stated that he understood his rights and wanted to make a statement. At no time did Spencer experience any difficulty in understanding appellant. Appellant never indicated that he had difficulty understanding the questions asked him. At no time was appellant threatened, coerced, or forced to make a statement.
During the conversation, appellant became very emotional and "broke down" several times. Afterwards, Spencer had appellant review his statement as he reduced it to writing. Appellant initialed each page and the corrections made. He then signed the statement.
Dr. Thomas Worden, assistant professor of elementary education at Auburn University, testified that he specialized in reading education and administering tests to persons from pre-school to adult age to determine their strengths and weaknesses in reading. He was qualified as an expert in the field.
Worden administered a battery of reading skills and comprehension tests to appellant on April 7, 1981. He found appellant's oral and silent reading abilities to be at primer or pre-first grade level and his listening comprehension level to be at sixth grade level. He also administered direction-following, sentence dictation, and "survival word recognition" tests.
Worden also performed a readability test on the rights and waiver form used by *Page 1256 
Spencer prior to his interrogation of appellant. Worden concluded that the form was written at an eighth grade, second semester level. He opined that appellant could not read or understand the form sufficiently to comprehend its import.
Worden testified that appellant was "street-wise." Nevertheless, he stated that appellant could not clearly understand the rights and waiver form. Worden did not think that appellant could have "faked" the answers to his tests regardless of his past experience with "the law" and Worden's inexperience at testing criminals. Appellant was the only person Worden had tested who had been charged with a crime.
At trial, Terry Frye, a climinal psychologist, testified to the results of a series of tests which indicate an individual's intelligence quotient (I.Q.). Frye stated that appellant told him that he had completed the eighth grade. He found appellant's I.Q. to be eighty-four, which is classified at the low range of normal. Frye opined that appellant would have had only a limited understanding of Spencer's questions.
We note that appellant introduced his oral statement into evidence through his cross-examination of Watkins. This statement was, in substance, the same as the statement transcribed by Spencer and which appellant now challenges. It was after appellant had initially introduced his oral statement that the State offered his written statement into evidence. Moreover, appellant testified to substantially the same facts as those contained in his written statement. He testified that the written statement was a true and accurate account of the events of the instant incident. He admitted shooting and robbing the victim. Throughout the course of his testimony, appellant had no difficulty in understanding the questions propounded to him by his counsel and the State. His answers were responsible and relevant, clearly indicating his ability to comprehend the import, at times, of difficult and complex questions.
Even if the admission of appellant's written confession was error, which we find was not, where the defendant testifies to essentially the same facts as contained in his confession, introduces the substance of his written confession through an oral statement, and admits his participation in the crime, we cannot ascribe reversible error to the admission of the statement. Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert.denied, 399 So.2d 899 (Ala. 1981); Thomas v. State,373 So.2d 1149 (Ala.Cr.App.), aff'd, 373 So.2d 1167 (Ala. 1979), rev'don other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133
(1980); Burlison v. State, 369 So.2d 844 (Ala.Cr.App.), cert.denied, 369 So.2d 854 (Ala. 1979); Mack v. State, 348 So.2d 524
(Ala.Cr.App. 1977).
 III
Appellant asserts that a comment made by the prosecutor during his guilt-phase closing argument constituted reversible error.
To place the comment in its proper perspective, we quote from the record:
 "[Prosecuting attorney] . . . I want each and every one of you to know that the defendant has had a fair trial. I want you to know that he has had competent attorneys all the way through this, and all of the other assistance that was needed in this case. And he has had a fair trial; and he has certainly had a more fair trial than Gable Holloway got when he was backed up to that embankment and executed out on that dirt road.
 "What trial did Gable Holloway have? They have come in here and spoken well for this defendant, good lawyers. Should he be convicted, they will speak for him all the way to the United States Supreme Court, and that's fine. That's the way it should be; but who speaks for Gable Holloway or Virginia Holloway; who speaks for them?
". . .
 "MR. BALSKE: Your Honor, at this time, I would like to object and ask for a mistrial on the grounds that in Mr. Myers's closing argument, he instructed *Page 1257 
the jury that if the defendant was convicted that we would appeal the case all the way to the Supreme Court.
". . .
 "THE COURT: Well, are you asking me to instruct the jury to disregard any statement to that effect?
 "MR. BALSKE: No, because that would bring it just more to their attention and I just simply wanted it entered on the record.
 "THE COURT: Well, I'll be happy to instruct the jury to disregard that part of his argument, and I will be happy to poll the jury further to make sure and see if that would affect an individual verdict of any individual juror in this case; but, as far as the motion for a mistrial is concerned, I am going to deny that." (Emphasis added.)
Contrary to appellant's contention, the above underlined comment does not appear to have been a deliberate attempt by the prosecutor to lessen the jury's responsibility by suggesting or implying that any mistake it might make would be remedied on appeal. Rather, when viewed in the context of the whole closing argument, it is clear that the prosecutor was attempting to discount any sympathy that the jury might feel for appellant and complimenting the full and fair representation afforded appellant by two distinguished lawyers. Throughout the State's closing argument, there is no hint or innuendo of that which appellant suggests.
Further, while a comment upon a defendant's availability of appeal has been held to be an improper subject for closing argument, Pilley v. State, 247 Ala. 523, 25 So.2d 57 (1946);Brothers v. State, 236 Ala. 448, 183 So. 433 (1938), it falls within that class of improper arguments whose prejudicial effect may be remedied and eradicated by prompt, swift, and thorough curative instructions by the trial court. See Manessv. State, 57 Ala. App. 431, 329 So.2d 120, cert. denied,295 Ala. 411, 329 So.2d 126 (1976); Vice v. State, 32 Ala. App. 59,22 So.2d 107, cert. denied, 246 Ala. 672, 22 So.2d 110 (1945).
In the instant case, the trial court offered to eradicate the possible prejudice suffered by appellant by instructing the jury to disregard the above comment. It further offered to poll the jury to determine the effect of such instructions. Appellant refused the offers, asserting that such would serve only to compound the situation and place more emphasis on the comment. By his actions, appellant prevented the trial court from sustaining his objection and curing the error. To have appellant now benefit from such would be tantamount to his inviting error. See e.g., McDaniel v. State, 418 So.2d 932
(Ala.Cr.App.), cert. denied, 418 So.2d 934 (Ala. 1982).
In addition, the trial court, in its oral charge, instructed the jury that the arguments of counsel are not evidence. It also instructed the jury that it was its duty to determine appellant's guilt or innocence solely on the evidence presented.
In light of the above, we find the above comment to have had no impact or influence upon the jury's verdict. This is especially true in view of the overwhelming evidence of appellant's guilt. Consequently, no reversible error occurred in the trial court's denial of appellant's motion for a mistrial.
 IV
Appellant asserts that the trial court erred in denying his motion for a mistrial, made during the sentencing phase closing argument of the State, where the prosecutor suggested that a sentence of life imprisonment without parole might not prevent appellant from, at some time, being released from prison.
During the initial phase of the State's closing argument, the prosecutor indicated that appellant had committed the instant offense while he was on parole. Consequently, he argued that appellant had been given an opportunity to change his life and could not be rehabilitated. *Page 1258 
Following the State's comments summarized above, appellant's counsel argued as follows:
 ". . . The position of the District Attorney's office, their position is that Mitch can't be rehabilitated. . . . [T]hat's no reason for you to vote for him to die because our legislature has said that if somebody commits capital murder, or a capital offense, is that the only other sentence that you can give him is life without parole.
 "That's life without parole, there's no parole, no way. That's it. Mitchell will spend the rest of his life down at Holman Station, Alabama, in a lockup by himself, isolated with those others that are sentenced to life without parole. That is where he is going to spend the rest of his life, so whether you think he is going to be rehabilitated or not, that doesn't really matter right now. That shouldn't help you decide, because he is going to be in that cell for the rest of his life. He will not be paroled.
". . .
 "What are the reasons? What are the reasons that you should kill Mitchell Rutledge? There are three possible reasons, I think you will admit.
". . .
 What's the second reason for giving capital punishment in this cause, or any case? For the protection of society. . . . But the death sentence in this case will not protect society anymore than your other choice, life without parole; because Mitchell will spend the rest of his natural life behind bars. There is no chance that he is going to commit such an offense again, even if you all think that he would if he were given a chance. Society will be protected and you don't need to return a sentence of death to fulfill your civic duty that way. That will be taken care of by the legislature, and that's why they provided the next most serious punishment to death, life without parole, as an alternative."
In rebuttal, the State made the following comments:
 "And then, you heard Mr. Balske telling you what they wanted for this defendant, is life without parole. Mr. Balske told you because with that sentence there is no chance of him ever doing anything like this again and him spending the rest of his life in prison, because that is what `life without parole' means, and there is no chance that he will get out. That's what Mr. Balske told you.
 "Ladies and gentlemen of the jury, that remark scares me to death. I'm not sure that there is anything such as life without parole —
 "MR. BALSKE: Objection, Your Honor, and may we approach the bench?
 "MR. MYERS: I've got the right to respond in kind; Mr. Balske opened this up."
An off-the-record conversation then occurred with appellant moving for a mistrial. The trial court then informed the State that it would not be allowed to argue clemency, but agreed with the State that appellant had argued that under a sentence of life without parole he would be "locked up forever, and he [the State] has the right to argue that he may not be locked up forever." The motion was denied.
The State continued its closing:
 "Life without parole. Mr. Balske came up and told you that there is no chance that he [appellant] would ever get out again. I submit to you, ladies and gentlemen, that you can apply your own common sense to that statement. I submit to you that, as long as there are parole boards, as long as there are Federal Courts in the State of Alabama, and as long as the legislature of the State of Alabama still exists, there is a chance that this defendant will get out, so do not be misled for a minute; and I don't think that you were when this man gets up and tells you that there is just no chance that he [appellant] will ever get out. You know better than that, and that's what scares me about life without parole or what it is supposed to be. Life without parole." *Page 1259 
In order to determine whether the above statement of the prosecutor was improper, it must be examined in the context and light of what had previously transpired, that is, in light of appellant's argument, which the prosecutor was answering.Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibsonv. State, 347 So.2d 576 (Ala.Cr.App. 1977).
As a general rule, remarks or comments of the prosecuting attorney, including those which might or otherwise would be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements. Shewbart v.State, 33 Ala. App. 195, 32 So.2d 241, 243, cert. denied,249 Ala. 572, 32 So.2d 244 (1947). Wide latitude is given to the prosecuting attorney in making reply to an argument previously made by defense counsel. Evans v. State, 338 So.2d 1033
(Ala.Cr.App. 1976), cert. denied, 348 So.2d 784 (Ala. 1977).
We find the complained of comments of the prosecuting attorney to be replies in kind to the previous comments of appellant's counsel. They were retaliatory statements with a clear reference to the argument made by appellant's counsel. Appellant cannot complain of the remarks when they were invited, provoked, or occasioned by his own action or that of his counsel. Wilder v. State, 401 So.2d 151 (Ala.Cr.App.),cert. denied, 401 So.2d 167 (Ala. 1981).
Consequently, we find no error in the trial court's denial of appellant's motion for a mistrial.
 V
We find no constitutional requirement that the jury specify the aggravating and mitigating circumstances it finds and considers, when it returns its punishment recommendation. Such is the rule under the Beck modified capital felony statute, under which appellant was tried, and the statute enacted in response to Beck. See Whisenhant v. State, 482 So.2d 1225
(Ala.Cr.App. 1982); Bush v. State, 431 So.2d 555 (Ala.Cr.App. 1982), aff'd, 431 So.2d 563 (Ala. 1983).
 VI
We find no merit in appellant's contention that a defendant in a capital felony case is entitled to have the jury instructed, during the sentencing phase, as to the consequences of a "hung" jury. Coulter v. State, 438 So.2d 336 (Ala.Crim.App. 1982); Whisenhant, supra.
 VII
The issue of the constitutionality of the Alabama Supreme Court's action in Beck v. State, 396 So.2d 645 (Ala. 1980), has previously been answered adversely to appellant's contention.Coulter, supra; see also Clisby v. State, 456 So.2d 95 (Ala. 1983).
 VIII
Applying the standards of review enumerated in Beck, we find that the crime for which appellant was convicted is one that is properly punishable by death, and that the instant death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Next, we find that similar crimes throughout the State are being punished capitally and that the evidence fully supports the finding of the statutory aggravating circumstances enumerated by the trial court in its order fixing appellant's punishment at death. Further, the punishment imposed upon appellant is appropriate and not excessive or disproportionate in relation to the penalty imposed in similar cases, considering both the crime and the defendant. The record does not reveal whether appellant's accomplices were convicted; it appears that appellant was the first of the group to be tried. Thus, nothing exists from which a comparison can be made. Nevertheless, we find the punishment imposed upon appellant fully supported by the record. See generally, Womack v. State, 435 So.2d 754
(Ala.Crim.App. 1983). *Page 1260 
We have carefully examined the instant record, as well as addressed each issue raised by appellant in his brief. In both instances, we find no error. We have searched the record pursuant to A.R.A.P. 45A and find no error which "has or probably has adversely affected the substantial right of the appellant."
Consequently, the judgment of conviction and sentence of death are hereby affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's findings of fact, setting forth its findings as to aggravating and mitigating circumstances, are attached as Appendix A.
[2] The master jury book is the master jury box referred to in §12-16-58, Code of Alabama 1975.
 APPENDIX "A" IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA, CRIMINAL DIVISION THE STATE OF ALABAMA, PLAINTIFF, VS. MITCHELL RUTLEDGE, DEFENDANT. CASE NO. CC 81-139 DETERMINATION OF SENTENCE BY COURT FIXING DEFENDANT'S PUNISHMENT AT DEATH
The defendant in this case, Mitchell Rutledge, was convicted on June 3, 1981 by a jury on a charge of intentional killing of a human being during the commission of a robbery. Following this guilt-finding phase of the trial, a sentence-determining phase of the trial was held before the same jury on June 4, 1981, as mandated by the Alabama Supreme Court in the case ofBeck v. State, 396 So.2d 645 (Ala. 1980), and the defendant's punishment was fixed by the jury's verdict at death. This being one of the capital offenses defined under Section 13A-5-31 of the Alabama Criminal Code, the Court, under the provisions of Sections 13A-5-32 and 13A-5-33 of the said code, fixed today, Tuesday, June 16, 1981, at 9:00 A.M. as the time for the conducting of a hearing before the Court, without a jury, to aid the Court to determine whether or not the Court will sentence the defendant to death or to life imprisonment without parole. The District Attorney, the defendant and the defendant's attorneys agreed in Open Court on June 4, 1981 that no further evidence or arguments need be offered at the hearing today and that the determination of the defendant's punishment was being submitted to the Court on the testimony taken during the guilt-finding and sentence-determining phases of this trial and the arguments heretofore offered by the attorneys during the trial, all of which has been heard and carefully considered by the Court.
When this hearing was called on this day, there appeared the defendant with his attorneys and also the District Attorney representing the State of Alabama. The State and the defendant were again given the opportunity to offer any further evidence or argument but both stated that there was nothing further to submit.
The Court finds from the evidence that at the time of the commission of the offense in this case on December 23, 1980, the defendant, Mitchell Rutledge, was 21 years of age, had completed the 8th grade of school, was of normal intelligence, and had the capacity to appreciate the criminality of his conduct. He had been recently paroled from the Alabama penitentiary and was unemployed. In the late afternoon or early evening of that day, the defendant together with two companions, Rayfield Davis and Alvin Morgan, left Phenix City, Alabama, for the purpose of going over the river into Columbus, Georgia, to rob someone to get some Christmas money. To aid them in carrying out the planned robbery, Rayfield Davis was carrying a pistol which Alvin Morgan had borrowed from a friend which was loaded with bullets purchased by Rayfield Davis with a dollar given him by the defendant.
After crossing the bridge into Columbus, the three of them walked down to Broad Street and went into the Paradise Club. Upon entering the club, they saw one Billy Threatts who was standing at the bar talking to a woman. Billy Threatts, upon *Page 1261 
seeing them, invited them to have a drink with him from a half-full fifth of rum he had. The four of them got some cups, sat down, and during the next hour or so, drank the rum straight until it was all gone. While sitting and drinking, they told Billy Threatts of their plan to rob someone and he asked to join them. The four of them left the club after finishing their drinks and walked down to First Avenue to look for someone to rob.
While on First Avenue, they saw a van parked near the Fox and Dream Theaters. They then waited outside of the theatres for the driver of the van to appear. Shortly thereafter, the show at one of the theatres let out and they saw a man walk across the street toward the van. The four of them then walked toward the van. Billy Threatts then walked up to the driver's side after telling the other three that "I'm gonna get him". The other three continued walking past the van until they heard the horn blow. At this time, Billy Threatts had the passenger door open and the motor running. The three of them then got in the van with Billy Threatts and the owner of the van, Gable Holloway. They began riding around Columbus with Billy Threatts driving and then drove across the river through Phenix City. During this ride, they found some marijuana in a coat in the van and they all began smoking it. Also during the ride, the four of them robbed their victim, Gable Holloway, of twenty or twenty-five dollars. After entering Lee County sometime after 10:00 P.M. Billy Threatts drove the van along Highway 280/431 in the direction of Opelika but turned off on a dirt road near Salem before getting to Opelika. He drove down the road about a mile, stopped the van, got out, and then forced Gable Holloway out at gun point. Threatts had gotten the pistol from Rayfield Davis earlier in the evening before they kidnapped their victim. The defendant, Davis and Morgan followed Threatts and Holloway out of the van. The defendant asked Threatts what they were going to do with Holloway and Rayfield Davis said to kill him because Holloway knew him. Threatts also said kill him because Holloway knew him also. Gable Holloway then began to beg for his life saying that he had a wife and child to support. They all then began laughing at their victim as he begged for his life. Threatts then handed the pistol to the defendant. In the words of the defendant, "everyone except the dude was laughing". Someone said "go ahead and do something" and the defendant then proceeded to kill his helpless victim as he pleaded for mercy. The defendant showed him no mercy whatsoever. At a distance of 5 or 6 feet from Holloway, the defendant fired the pistol at his victim. Holloway didn't fall after the first shot. The defendant then fired two more shots at his victim at point-blank range and Holloway fell to the ground. Rayfield Davis then grabbed the defendant and said "let's go". Someone else told the defendant to empty the gun. He did by firing twice more at his victim as he lay on the ground.
The four of them then got back in the van and the defendant returned the pistol to Rayfield Davis. Billy Threatts then drove the van back to Phenix City where he let the defendant and Alvin Morgan out on 15th Place. Morgan and the defendant then parted, Morgan going to the home of his girl friend and the defendant going to his home and to bed about midnight. The next day, Christmas Eve, the defendant heard over the radio about a dead man being found near Salem. However, he neither reported the crime nor cooperated with the police until being picked up by law enforcement officers a few days after New Year's Day.
This Court further finds beyond a reasonable doubt, as aggravating circumstances in this case, that at the time of the commission of this capital felony, the defendant was under a sentence of imprisonment being under parole from the Alabama State Penitentiary and that this capital felony was committed while the defendant was engaged in flight after committing the crime of robbery.
The Court has carefully and diligently searched the evidence in this case for mitigating *Page 1262 
circumstances and finds only that the defendant has no record of criminal convictions for crimes involving force or violence to persons.
This was a cold blooded and senseless killing committed knowingly and intentionally by the defendant, a paroled convict, without any mercy for his victim whatsoever, for the heartless purpose of preventing this victim of a robbery from ever testifying against the defendant. The Court finds that the aggravating circumstances of the intentional killing in this case far outweighed the one mitigating circumstance found by the Court.
IT IS, THEREFORE, ORDERED AND ADJUDGED BY THE COURT as follows:
1. That this Court hereby accepts the death penalty fixed by the Jury in this case and hereby sentences the defendant, Mitchell Rutledge, to death.
2. That the sentence of death hereby pronounced in this case shall be executed at any hour on the day of September 7, 1981, in the manner and by the person provided by law.
DONE this the 16th day of June, 1981.
 /s/ G.H. Wright, Jr.
CIRCUIT JUDGE