Charles Douglas Aultman was convicted of the capital offense of murder during the course of a kidnapping or an attempt thereof, in violation of § 13A-5-40(a)(1), Code of Alabama 1975. The jury recommended that he be sentenced to life imprisonment without parole; the trial judge accepted the jury's recommendation and sentenced him accordingly. Aultman appealed.
The evidence in this case shows that on December 27, 1985, the victim, Freda Rosborough, and her husband, Hank Rosborough, were separated and were in the process of obtaining a divorce. At the time, Freda was living with her parents and Hank was living in an apartment above his mother's house in Tuscaloosa County, Alabama. On the afternoon of December 27, Freda went to Hank's apartment to pick up some of her belongings. After she left Hank's apartment, she went to a birthday party at the Best Western Motel in Tuscaloosa. She had telephoned her mother earlier and had told her that she would be late arriving home. At some point, Hank arrived at the Best Western. When he saw Freda's car in the parking lot, he asked Delois Taylor to go with him to the Sidetrack Lounge.
At the Sidetrack Lounge, Hank and Taylor saw Aultman. Hank and Aultman were friends and they worked together. Aultman supposedly left the Sidetrack Lounge around 10:00 p.m. to telephone his girlfriend. Freda was seen leaving the party at the Best Western motel around the same time.
At approximately 10:20 p.m., a woman dressed in clothes similar to those worn by Freda on the night of December 27, was seen outside Hank's apartment standing by a truck that looked like Aultman's truck. Shortly thereafter, a cashier at a Texaco gasoline station, located at the intersection of Highways 43 and 82 in Northport, noticed an automobile similar to Freda's automobile in the parking lot adjacent to the Northport City Hall. The reason the cashier noticed this car was that the taillights of the car were on. At some point, the cashier saw a truck similar to Aultman's *Page 355 
truck parked next to the this car. About an hour later, several residents of the Biscayne Hills neighborhood in Northport heard two loud noises that sounded like gunshots, coming from a field near the neighborhood.
Hank and Taylor left the Sidetrack Lounge around midnight. They went to a road near the airport and talked until approximately 2:00 a.m. From there, they went back to the Best Western so that Taylor could pick up her car. When Hank arrived at the Best Western, he saw Freda's father, Mr. Elledge. Mr. Elledge told Hank that he had been looking for Freda but could not find her. Hank then began looking for the victim but he went home after being unable to locate her. Around 4:00 a.m., Mr. Elledge found Freda's car in the Northport City Hall parking lot. Her purse was on the front seat and the car keys were in the ignition. The brake pedal of the car was depressed; thus, the brake lights had remained on. Mr. Elledge testified that his daughter knew that she had to lift up on the brake pedal to turn off the brake lights or else the battery would run down.
Freda's body was discovered in an open field near the Biscayne Hills neighborhood on the morning of December 28. Aultman had been seen near this area around 8:30 that morning. The victim was found lying on her back with her legs spread apart and her knees pulled up toward her body. She had no clothes on below her waist except her hose, which were rolled down toward her feet. There were mud smears on her thigh and leg. She had sustained a gunshot wound to the neck and another to the chest, either of which could have been fatal. There were bruises on her neck and on her leg. Several of her artificial fingernails were found near her body. A button found at the scene matched the buttons on the shirt Aultman had been wearing on the night of December 27. Two spent .30 caliber shell casings were found near the body, and it was determined that they had been fired through a Remington 700 .30-06 caliber rifle that was recovered from the Aultman's bedroom. Shoeprints at the scene were found to have been made by shoes or boots of a design similar to that of the boots Aultman was wearing when he was arrested. Tire prints found at the scene were similar to those made by the tires on Aultman's truck. A hair, which had been forcibly removed, was found on the passenger side of the appellant's truck; this hair was similar to the victim's head hair. Soil removed from Aultman's truck was similar to soil taken from the scene where Freda's body was found.
 I.
Aultman contends the trial court erred by giving the following instruction to the jury:
 "Now, ladies and gentlemen of the jury, evidence has been introduced in this case concerning alleged statements made by the defendant. And while the court determines the voluntariness of such statements, the jury determines their weight or credibility and you may disregard the alleged statements . . . which you find to be unworthy of belief or of which you entertain a reasonable doubt as to the truth of these statements."
In Ex parte Singleton, 465 So.2d 443, 446 (Ala. 1985), the Alabama Supreme Court held that "[i]t is improper for a trial judge to disclose to the jury his preliminary finding that the confession was voluntary and, therefore, admissible." See alsoBush v. State, 523 So.2d 538 (Ala.Cr.App. 1988). While the trial judge erred by telling the jury that the court determines the voluntariness of the statements, we find the error not to be prejudicial, because the judge also instructed the jurors that they were the ultimate decisionmakers as to how much weight, if any, the statement should be afforded. Singleton;Clark v. State, 621 So.2d 309 (Ala.Crim.App. 1992).
 II.
The appellant contends that the trial court erred in refusing to grant his challenge for cause as to prospective juror A.M. The following portion of the record is relevant to this issue. *Page 356 
 "MR. STEVERSON: [the prosecutor] Did you form any opinions or impressions about the case when you read this article in the paper?
"JUROR A.M.: No, sir.
 "MR. STEVERSON: Okay. Could you lay aside any feelings that you may have read as a result of reading about the case in the paper and render a verdict, if you were chosen on this jury, based solely on the evidence that will be presented in this courtroom?
"(No response.)
"MR. STEVERSON: Do you remember my question?
"JUROR A.M.: No.
 "MR. STEVERSON: Would you — if you were chosen on this jury, could you listen to the evidence that will be presented in this courtroom and not be affected by anything that you read in the newspaper?
"JUROR A.M.: No, no, I wouldn't be affected.
"MR. STEVERSON: So you could do that.
"JUROR A.M.: Yes, sir.
"MR. STEVERSON: That's all the questions I have.
 "MR. GLASSROTH: [defense attorney] A.M., you mentioned that you were — back at the time it happened, you were talking about it?
"JUROR A.M.: (Nods head indicating yes.)
"MR. GLASSROTH: With whom did you talk about it?
"JUROR A.M.: My husband.
 "MR. GLASSROTH: Do you remember what you discussed?
 "JUROR A.M.: No, just what I said. I don't remember if I was the one that read it or if he was reading it and telling me about it.
 "MR. GLASSROTH: Okay. How did it make you feel when you heard about it? Do you remember that?
"JUROR A.M.: It was upsetting.
"MR. GLASSROTH: What about it upset you?
"JUROR A.M.: The fact that she was so young.
"MR. GLASSROTH: Do you remember how old she was?
"JUROR A.M.: (Shakes head indicating no.)
"MR. GLASSROTH: Just young?
"JUROR A.M.: Yeah.
 "MR. GLASSROTH: Was it very upsetting or was it just the kind of thing where you read bad news and tragedies all the time in the paper? Did this one stick with you?
"JUROR A.M.: Yeah.
 "MR. GLASSROTH: Do you have any idea why it might have?
"JUROR A.M.: Huh-huh (no).
"MR. GLASSROTH: How old are you?
"JUROR A.M.: Thirty-one.
 "MR. GLASSROTH: Not that much older, I guess. Do you think that may have had something to do with it?
 "JUROR A.M.: Probably. And the fact that she was out at night because I have been out by myself at night before.
 "MR. GLASSROTH: Let me ask you this: Do you think like that might make it a little uncomfortable for you to be sitting on this case?
"JUROR A.M.: In a way, I do.
 "MR. GLASSROTH: So — Are you telling us, then that you don't really think you could listen objectively and set aside all those fears?
 "JUROR A.M.: I think I could listen objectively, but —
 "MR. GLASSROTH: Don't get me wrong, there's just —
 "JUROR A.M.: I wouldn't let it emotionally upset me.
 "MR. GLASSROTH: There is nothing wrong with having feelings with this. It's good of you to share this with me. This is exactly what we want you to do. And if you feel that your feelings about it would interfere as a juror, we want you to let us know and that is what the purpose of this is and that is why we asked you to talk about this.
 "It strikes me that you were troubled about it when you were talking about it *Page 357 
and I caught that and I understand that and I can certainly see how you could be. And I want to know whether — and Doug wants to be sure that people we get on this jury are people who don't have that kind of emotional stuff. Do you feel that is going to interfere with you. If so, tell us.
 "JUROR A.M.: The way I feel about the whole situation?
"MR. GLASSROTH: Uh-huh (yes).
 "JUROR A.M.: It could affect — I don't really know what to say because I don't know all the facts about it.
"MR. GLASSROTH: I understand.
 "JUROR A.M.: And I feel like in a way it could affect my answer.
 "MR. GLASSROTH: Well, I detected in you something very unsettled about it and I haven't asked anybody else about this but I sensed it in you and I hope you understand that I am not — like I said earlier, I am not trying to pry into your personal life or anything like that, but I want to be sure that you're clear with us. And remember, there is nothing that says there is anything wrong with you not being a juror in this case. If you feel that it's — that you feel too much in common or it's too close or it troubled you too much that you can't really be that way about it, everyone will understand and no one is going to have a problem and we are not going to write it down and put it in the newspaper, so don't worry about that. I mean, just go ahead any tell us. I mean, I sense that you really do. Am I sensing it right?
"JUROR A.M.: Uh-huh (yes).
"MR. GLASSROTH: Thank you, A.M.
 "THE COURT: Let me ask you a question, A.M. I understand you have some feelings about this and it might be upsetting to you. Would your feelings cause you to be where you could not listen to the evidence and render a fair and impartial verdict based on the evidence and the law as the Court instructs you?
 "JUROR A.M.: I don't know how it would make me feel, you know, after I listen to the evidence.
 "THE COURT: Well, I understand your feelings. But would that affect your verdict you render in the case, just strictly your feelings, or would you be able to listen to the evidence and the law as the Court tells you what the law is and render a fair and impartial verdict based on the evidence and the law, or would your feelings cause you to be unable to be impartial?
"JUROR A.M.: I think I could be impartial.
"THE COURT: Okay. Thank you.
 "MR. THOMPSON: [defense attorney] One question, Your Honor?
"THE COURT: Surely.
 "MR. THOMPSON: You said you think you could, A.M. Let me put it to you this way: It would be somewhat difficult for you to be objective in this type of case toward Doug; isn't that correct? It would be somewhat difficult?
 "JUROR A.M.: It wouldn't be difficult to be objective.
"MR. THOMPSON: It would not?
"JUROR A.M.: No.
 "MR. THOMPSON: I understood that you have some emotional feelings about it that you would have to lay aside?
"JUROR A.M.: Yeah, I would.
 "MR. THOMPSON: You would have to lay them aside in order to be fair to Doug?
"JUROR A.M.: No.
"MR. THOMPSON: What do you mean, then?
"THE COURT: Mr. Thompson, I can't see her.
 "JUROR A.M.: I can't understand what you're trying to ask me.
 "MR. THOMPSON: Well, I am wondering what makes it difficult for you in this case, A.M. Difficult to do what?
 "JUROR A.M.: I still don't understand what you're trying to ask me.
 "MR. THOMPSON: Am I correct in saying that you said it was difficult? You used the word 'difficult' yourself a while ago? Or should we start over again?
"JUROR A.M.: Maybe you should start over. *Page 358 
 "MR. THOMPSON: This kind of case is the case you wouldn't want to sit on, right? You identify with Freda Rosborough, do you not?
"JUROR A.M.: Uh-huh (yes).
 "MR. THOMPSON: All right. And you kind of put yourself in her same situation; is that correct?
"JUROR A.M.: Not necessarily.
 "MR. THOMPSON: Not necessarily. But to some degree, though?
"JUROR A.M.: Yes, sir.
 "MR. THOMPSON: All right. So we have got this one nailed down, then. You do put yourself in her place to some degree and you identify with her; is that correct?
"JUROR A.M.: Yes, sir.
 "MR. THOMPSON: Now, that sort of — that sort of is a strike against Doug, isn't it?
 "JUROR A.M.: Yeah, it would be a strike against him.
 "MR. THOMPSON: He would have to some way overcome your biases and your prejudices, right?
"JUROR A.M.: (Nods head indicating yes.)
 "MR. THOMPSON: So he comes into this courtroom with you — And I am not blaming you, now, please don't misunderstand. Please don't misunderstand me. He comes in with a strike so far as you're concerned in this case here?
"JUROR A.M.: (Nods head indicating yes.)
 "MR. THOMPSON: And you're nodding your head and that is a fair statement?
"JUROR A.M.: Yes, sir.
"MR. THOMPSON: Okay.
 "THE COURT: Let me ask one question. A.M., are you saying that your feelings in this case would shift the burden of proof so he is going to have to prove himself innocent? Is that what you're saying?
 "JUROR A.M.: I feel like somebody is innocent until they are proven guilty.
 "THE COURT: Well, just what effects would your feelings —
 "JUROR A.M.: I am not going to walk in with my feelings and, you know, that he's guilty when I walk in the courtroom.
 "THE COURT: Well, are you telling the Court that you can lay aside your feelings and give him a fair and impartial trial?
"JUROR A.M.: Uh-huh (yes).
 "THE COURT: Okay. Mr. Freeman, do you have anything else?
 "MR. FREEMAN: [the prosecution] No, sir. I don't believe I have any questions at this point. Thank you.
"THE COURT: Any further questions?
 "MR. THOMPSON: I think the last thing I said — and I just want to nail this one down again. You said yes, Doug comes in this case, so far as you're concerned, with a strike against him from the feelings that you have concerning his case and this type of offense; is that correct?
"JUROR A.M.: Yes, that is what I said.
 "MR. FREEMAN: Let me ask a question, then, A.M., if I understand you right. First of all, nobody likes murderers; is that right? And are you saying you have a bias — if your were persuaded and convinced that someone committed some horrible crime, that you wouldn't like them; is that what you're saying? You're not saying that about this particular man or any other person?
"JUROR A.M.: That's true.
 "MR. FREEMAN: Okay. And as far as sitting on this case or any other case, you would be somewhat uncomfortable sitting in a murder case; is that what you're really saying?
"JUROR A.M.: Uh-huh (yes).
 "MR. FREEMAN: Okay. But as far as this particular case and as far as this particular defendant, could you give him a fair trial?
"JUROR A.M.: If I had to.
 "MR. FREEMAN: In other words, could you base — arrive at a verdict, at a fair and impartial verdict, after you heard the evidence that was presented in this courtroom and follow the law as you were told by the Court? Could you then give this man a fair and impartial verdict? *Page 359 
"JUROR A.M.: Yes.
 "MR. FREEMAN: All right, sir. I believe that's all.
 "MR. THOMPSON: Do you know anything about baseball?
"JUROR A.M.: Not much.
 "MR. THOMPSON: How many strikes does someone get in baseball?
"JUROR A.M.: Three.
 "MR. THOMPSON: All right. You're playing against another team. Your team gets one strike and you're out and the other team gets three strikes. What do you think about that? Is that fair?
"JUROR A.M.: No.
 "MR. THOMPSON: You told us a while ago that Doug came in here with a strike against him. Would you want to be in a situation when your life was at stake to come into the courtroom with a strike against you?
"MR. STEVERSON: Now, you Honor —
"JUROR A.M.: No.
"MR. STEVERSON: — to the form of that question.
"THE COURT: Well, I will overrule.
 "MR. THOMPSON: The answer to my question is no, you would not want to come in on this situation with a strike against you; is that correct?
 "JUROR A.M.: I feel like you're trying to confuse me.
 "MR. THOMPSON: No, ma'am. I am only using your words, ma'am. Do you remember you said 'Yes, it's right that Doug comes in with a strike against him'? Those are your words, ma'am.
 "MR. STEVERSON: Judge, I will renew my objection and state the grounds — he is asking the juror to put herself in the place of the defendant.
"MR. THOMPSON: She played baseball.
"MR. STEVERSON: No, he asked —
 "THE COURT: Well, let me ask this: What do you mean that the defendant would have a strike against him? What do you mean by that statement?
"JUROR A.M.: (No audible response.)
 "THE COURT: Would you be more likely to convict him, the fact that you have the feelings that you do?
"JUROR A.M.: No.
"THE COURT: Anything further?
 "MR. THOMPSON: You [have] nothing to add, do you? I see you're kind of thinking about it and we appreciate that. This is sort of going through your mind, isn't it?
"JUROR A.M.: Uh-huh (yes).
 "MR. THOMPSON: Did you want to express something without somebody asking you, with my asking you or without Mr. Dennis Steverson asking you? In other words, just telling it like it is without anybody trying to put words in your mouth? Will you just do that?
 "JUROR A.M.: I could be fair to either party. I feel like I could be fair. I know I could be fair to either party. I don't know what I meant about saying that I would walk in with a strike against him. I don't know why I even said that.
 "MR. THOMPSON: A.M., we appreciate your being so candid with us. Thank you, ma'am.
"THE COURT: Any further questions?
"MR. FREEMAN: No, sir.
"Thank you, A.M."
(R. 1148-61.)
This court has written:
 " '[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence.' Ex Parte Rutledge, 523 So.2d 1118, 1120 (Ala. 1988). '[A] trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse of discretion by the trial court.' Rutledge, 523 So.2d at 1120.
. . . . .
 " 'In challenging a juror for cause, the test to be applied is that of probable prejudice. . . . While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. . . . This Court must look to the questions propounded to, and the answers *Page 360 
given by, the prospective juror to see if this discretion was properly exercised . . . A reversal is not appropriate absent abuse of this discretion. . . .
 " 'Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. . . . This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.' Knop v. McCain, 561 So.2d 229, 232
(Ala. 1989). See also Wood v. Woodham, 561 So.2d 224 (Ala. 1989)."
Parker v. State, 587 So.2d 1072 (Ala.Crim.App. 1992).
After a review of the lengthy colloquy set out above, we do not find that the trial court abused his discretion by denying the challenge for cause. The juror clearly indicated that she could be fair and impartial and that she could decide the case based on the evidence presented at trial. Thus, we find no error with regard to this issue.
 III.
Aultman contends that the State's evidence was insufficient to prove his guilt of the capital offense as charged in the indictment. The indictment in this case reads as follows:
 "The Grand Jury of said County charge[s] that before the finding of this Indictment, CHARLES DOUGLAS AULTMAN, JR., alias DOUG AULTMAN, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of Freda Elledge Rosborough, by shooting her with a gun, strangling her, or by some means otherwise unknown to the Grand Jury, and said defendant caused said death during said defendant's abduction of, or attempt to abduct Freda Elledge Rosborough, with intent to inflict physical injury upon her, or to violate or abuse her sexually, in violation of Section 13A-5-40(a)(1) of the Code of Alabama."
(R. 3043.) Aultman does not argue that the State failed to establish a prima facie case of intentional murder. However, he does argue that the State failed to prove that the victim's death was caused during an abduction or an attempted abduction of the victim and that the victim was abducted with the intent to inflict physical injury upon her or to violate or abuse her sexually.
Section 13A-6-40(2), Code of Alabama 1975, defines the term "abduct" as "to restrain a person with intent to prevent his liberation by either: a. Secreting or holding him in a place where he is not likely to be found, or b. Using or threatening to use deadly physical force." In Jenkins v. State, [Ms. 90-1044, February 28, 1992], 1992 WL 71035 (Ala.Crim.App. 1992), this same issue was addressed under facts similar to those in this case. In Jenkins, the evidence showed that the defendant came into an Omelet Shoppe restaurant in Birmingham, where the victim was working as a cook. At some point, a witness saw the defendant and the victim drive off from the restaurant in a car. However, this witness could not testify "whether the victim went willingly or was abducted." There was testimony that the victim, who was a heavy smoker, "left behind her cigarettes, her lighter, her purse, and her paycheck." Several days later, the victim's nude body was found in a remote area on the side of Interstate Highway 59 near Pelham, Alabama. An autopsy revealed that the victim had died by manual strangulation. The State presented evidence tending to show that the victim was present in the car the defendant was driving on the night the victim disappeared. A boot print similar to prints made by the boots worn by the defendant was found at the scene where the body was discovered.
In holding that the evidence was sufficient to establish the offense of kidnapping in Jenkins, this court stated that the articles left behind by the victim tended to show that she did not go with the defendant *Page 361 
voluntarily, and it held that a reasonable juror could have concluded, from the evidence presented, that the victim did not voluntarily accompany the defendant to the remote area where her body was found. Likewise, in this case we conclude that the State did present evidence that Freda Rosborough was abducted. Certainly, the jury could have reasonably concluded that she would not have left her purse on the front seat of her car, her keys in the ignition, and the brake lights on if she had been accompanying the appellant voluntarily to the location where her body was later found. The evidence regarding the condition of the victim's body and the evidence regarding the crime scene would allow the jury to infer that Aultman abducted the victim with the intent to inflict physical injury upon her or to abuse or violate her sexually. Jenkins.
 IV. A
Several days after the murder in this case, Aultman was arrested on a D.U.I. writ; he was taken to the homicide unit. After being advised of his Miranda rights, he gave a statement to the police. During this time, he also gave his consent to searches of his room and his truck. He contends that his arrest on the D.U.I. writ was a "sham" and, therefore, that it was illegal, because, he says, it was made for the purpose of eliciting evidence from him regarding the murder. Thus, he claims that his statement and the evidence seized as a result of the search of his room and his truck should have been suppressed as the fruits of an illegal arrest. In Scarbrough v.State, 621 So.2d 996 (Ala.Crim.App. 1992), this court thoroughly discussed this issue in light of a similar fact situation. In Scarbrough, the defendant was arrested on a municipal arrest warrant, was taken into police custody and was given his Miranda warnings. After questioning by the police concerning a murder, the defendant confessed to that murder. The police admitted that when the defendant was arrested, they did not have probable cause to arrest him on a murder charge and that "the municipal arrest warrant was used so that the police could take the appellant into custody and question him." In holding that the arrest in Scarbrough was not illegal, this court stated:
 "It is well established that '[a]n arrest may not be used as a pretext to search for evidence.' United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). A pretextual arrest has been defined as 'the use of some minor offense, typically a traffic violation, as a tool for obtaining evidence or statements relating to a greater offense for which the police lack the required probable cause or reasonable suspicion otherwise to obtain.' Jonas, Pretest Searches and the Fourth Amendment: Unconstitutional Abuses of Power, 137 U.Pa.L.R. 1791, 1792 n. 5 (1989).
 "This case does not involve a 'fabricated' pretext, for here, if the motivation of the police is not considered, the appellant's arrest was legal because it was pursuant to a warrant. See Butterfoss, Solving the Pretext Puzzle: The Importance of Ulterior Motives and Fabrications in the Supreme Court's Fourth Amendment Pretext Doctrine, 79 Ky. L.J. 1, 5-6 (1990-91); Jonas, 137 U.Pa.L.R. at 1802-03. This is not a case where there was no probable cause or any judicial authorization to arrest the appellant for any offense. Furthermore, this case involves the execution of a preexisting arrest warrant and not a traffic stop following surveillance of the suspect. See Salken, The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses, 62 Temp.L.Q. 221 (1989)."
In Scarbrough this court also stated:
 " '[S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry. . . . The correct rule is that, while a showing of objectively reasonable good faith on the part of police officers will ordinarily redeem honest errors and *Page 362 
prevent the application of the exclusionary rule, in a case where the officers have taken no action except what the law objectively allows[,] their subjective motives in doing so are not relevant to the suppression inquiry. And the reason lies in the purpose of that rule: to deter unlawful actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which they acted is of no consequence.' "
Scarbrough, quoting United States v. Causey, 834 F.2d 1179,1184-85 (5th Cir. 1987). (Emphasis in Causey.) In the present case, the police did not do anything they were not legally permitted to do. Aultman was arrested on a D.U.I. writ and was brought to the homicide unit. He was advised of his Miranda
rights, and he voluntarily gave a statement and consented to a search of his room and truck. Aultman's arrest on the D.U.I. writ was legal; therefore, the trial court properly denied his motion to suppress his statement and the evidence seized from his room and truck.
 B
Aultman further contends that his statement should have been suppressed because he was not told that his father and his lawyer were waiting outside the interrogation room to see him. This contention is without merit, because Aultman never asked to see his lawyer or his father. An adult need not be informed of his lawyer's presence at the place where the adult is being interrogated when the adult does not ask to see his lawyer.Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410
(1986). See also Gilchrist v. State, 585 So.2d 165
(Ala.Crim.App. 1990); Ex parte Neelley, 494 So.2d 697 (Ala. 1986), cert.denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702. (1987) InO.M. v. State, 595 So.2d 514 (Ala.Crim.App. 1991), writquashed, 595 So.2d 528 (Ala. 1992), this court held where a juvenile does not request to see a parent, there is no obligation to inform the juvenile that a parent is waiting to speak to the juvenile. Clearly, an adult, such as Aultman, would not be entitled to be told that a parent is present and waiting to speak to him.
 C
Aultman argues that his statement should have been suppressed because the police never informed him that he was being questioned concerning the victim's murder. This contention is without merit. " 'This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of Miranda rights.' " Smith v. State,588 So.2d 561 (Ala.Crim.App. 1991), quoting Colorado v. Spring,479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).
 D
Aultman contends that he should have been repeatedly warned of his continuing right to cease interrogation at any time. InRobinson v. State, 429 So.2d 682, 683 (Ala.Crim.App. 1983), this court stated, "Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not require that a suspect have been warned that he has the right to stop answering questions at any time before being subjected to custodial interrogation by a law enforcement officer." There is no merit to this issue. Aultman was fully informed of his rights, and he made his statement after knowingly and intelligently waiving those rights.
 V.
Aultman contends that the videotapes, slides, and photographs admitted into evidence were redundant, irrelevant, and highly prejudicial. While there were numerous exhibits depicting the crime scene and while the victim's body was shown in these exhibits, and while several of the exhibits depicting the victim's body were extremely gruesome, we hold that there was nothing improper about their admission into evidence.
 "Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal *Page 363 
only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973).
 "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819
(1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex Parte Magwood, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
". . . .
 ". . . [P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood, 494 So.2d at 141. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id. The rules of law concerning photographs also apply to photographic slides. Goffer v. State, [430 So.2d 896
(Ala.Cr.App. 1983)]."
Ex parte Bankhead, 585 So.2d 112, 118-19 (Ala. 1991). See alsoMcNair v. State, [Ms. 90-1556, July 24, 1992], 1992 WL 172200 (Ala.Crim.App. 1992).
Our review of these exhibits leads us to conclude that the videos, the slides, and the photographs illustrated testimony concerning the crime scene and the evidence found there, including the victim's body. There was no abuse of discretion in the admission of these exhibits into evidence.
 VI.
Aultman contends that he was denied his right to a jury representing a fair cross-section of the community because, he says, "young adults of university student age and particularly those under 21 years of age" were underrepresented in the grand jury and petit jury selection process. (Appellant's brief, p. 80). In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664,668, 58 L.Ed.2d 579 (1979), the United States Supreme Court stated:
 "In order to establish a prima facie violation of the fair cross-section requirement, the Defendant must show (1) that the group alleged to be excluded is a 'distinctive group' in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury selection process."
Aultman has failed to establish a prima facie violation of the fair cross-section requirement, because he has not proved that the group he claims was underrepresented in the jury selection process constitutes a "distinctive group."
In Lockhart v. McCree, 476 U.S. 162, 174-75, 106 S.Ct. 1758,1775-76, 90 L.Ed.2d 137 (1986), the Supreme Court indicated that a "distinctive group" is composed of those persons who share immutable and unchangeable characteristics. In Cox v.Montgomery, 718 F.2d 1036, 1038 (11th Cir. 1983), the Eleventh Circuit Court of Appeals decided that "the young [adults aged 18 to 30] are not a distinctive group for purposes of jury venire." This holding was reaffirmed in Wysinger v. Davis,886 F.2d 295, 296 (11th Cir. 1989) ("Tuscaloosa County citizens between the ages of eighteen and twenty-five did not constitute a distinctive or cognizable group for purposes of the Sixth Amendment").
Moreover, in Rutledge v. State, 482 So.2d 1250, 1254
(Ala.Cr.App. 1983), (reversed on other grounds, 482 So.2d 1262
(Ala. 1984), the defendant alleged that "young persons nineteen to twenty-four years of age who are Alabama residents and Auburn University students" were a "distinctive group." While expressing *Page 364 
doubt about whether either age or student status could ever be a valid basis for finding that a group was "distinctive," this court held that the defendant failed to establish that this particular group was a cognizable or distinctive group. The defendant bears the burden of proving that the group in question is a "distinctive group." Willis v. Zant,720 F.2d 1212 (11th Cir. 1983), cert. denied, 467 U.S. 1256,104 S.Ct. 3546, 82 L.Ed.2d 849 (1984). Aultman has failed to meet his burden of proving that "young adults of university student age and particularly those under 21 years of age" are a "distinctive group."
The judgment of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.